Justice GINSBURG delivered the opinion of the Court.
*686 Tyson Timbs pleaded guilty in Indiana state court to dealing in a controlled substance and conspiracy to commit theft. The trial court sentenced him to one year of home detention and five years of probation, which included a court-supervised addiction-treatment program. The sentence also required Timbs to pay fees and costs totaling $ 1,203. At the time of Timbs's arrest, the police seized his vehicle, a Land Rover SUV Timbs had purchased for about $ 42,000. Timbs paid for the vehicle with money he received from an insurance policy when his father died.
The State engaged a private law firm to bring a civil suit for forfeiture of Timbs's Land Rover, charging that the vehicle had been used to transport heroin. After Timbs's guilty plea in the criminal case, the trial court held a hearing on the forfeiture demand. Although finding that Timbs's vehicle had been used to facilitate violation of a criminal statute, the court denied the requested forfeiture, observing that Timbs had recently purchased the vehicle for $ 42,000, more than four times the maximum $ 10,000 monetary fine assessable against him for his drug conviction. Forfeiture of the Land Rover, the court determined, would be grossly disproportionate to the gravity of Timbs's offense, hence unconstitutional under the Eighth Amendment's Excessive Fines Clause. The Court of Appeals of Indiana affirmed that determination, but the Indiana Supreme Court reversed. 84 N.E.3d 1179 (2017). The Indiana Supreme Court did not decide whether the forfeiture would be excessive. Instead, it held that the Excessive Fines Clause constrains only federal action and is inapplicable to state impositions. We granted certiorari. 585 U.S. ----, 138 S.Ct. 2650, 201 L.Ed.2d 1049 (2018).
The question presented: Is the Eighth Amendment's Excessive Fines Clause an "incorporated" protection applicable to the States under the Fourteenth Amendment's Due Process Clause? Like the Eighth Amendment's proscriptions of "cruel and unusual punishment" and "[e]xcessive bail," the protection against excessive fines guards against abuses of government's punitive or criminal-law-enforcement authority. This safeguard, we hold, is "fundamental to our scheme of ordered liberty," with "dee[p] root[s] in *687 [our] history and tradition." McDonald v. Chicago , 561 U.S. 742, 767, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (internal quotation marks omitted; emphasis deleted). The Excessive Fines Clause is therefore incorporated by the Due Process Clause of the Fourteenth Amendment.
I
A
When ratified in 1791, the Bill of Rights applied only to the Federal Government. Barron ex rel. Tiernan v. Mayor of Baltimore , 7 Pet. 243, 8 L.Ed. 672 (1833). "The constitutional Amendments adopted in the aftermath of the Civil War," however, "fundamentally altered our country's federal system." McDonald , 561 U.S., at 754, 130 S.Ct. 3020. With only "a handful" of exceptions, this Court has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States. Id. , at 764-765, and nn. 12-13, 130 S.Ct. 3020. A Bill of Rights protection is incorporated, we have explained, if it is "fundamental to our scheme of ordered liberty," or "deeply rooted in this Nation's history and tradition." Id., at 767, 130 S.Ct. 3020 (internal quotation marks omitted; emphasis deleted).
Incorporated Bill of Rights guarantees are "enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." Id., at 765, 130 S.Ct. 3020 (internal quotation marks omitted). Thus, if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires.[1]
B
Under the Eighth Amendment, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." Taken together, these Clauses place "parallel limitations" on "the power of those entrusted with the criminal-law function of government." Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc. , 492 U.S. 257, 263, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (quoting Ingraham v. Wright , 430 U.S. 651, 664, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) ). Directly at issue here is the phrase "nor excessive fines imposed," which "limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense.' " United States v. Bajakajian , 524 U.S. 321, 327-328, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998) (quoting Austin v. United States , 509 U.S. 602, 609-610, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) ). The Fourteenth Amendment, we hold, incorporates this protection.
The Excessive Fines Clause traces its venerable lineage back to at least 1215, when Magna Carta guaranteed that "[a] Free-man shall not be amerced for a small fault, but after the manner of the fault; and for a great fault after the greatness thereof, saving to him his contenement ...." § 20, 9 Hen. III, ch. 14, in 1 Eng.
*688 Stat. at Large 5 (1225).[2] As relevant here, Magna Carta required that economic sanctions "be proportioned to the wrong" and "not be so large as to deprive [an offender] of his livelihood." Browning-Ferris , 492 U.S., at 271, 109 S.Ct. 2909. See also 4 W. Blackstone, Commentaries on the Laws of England 372 (1769) ("[N]o man shall have a larger amercement imposed upon him, than his circumstances or personal estate will bear ...."). But cf. Bajakajian , 524 U.S., at 340, n. 15, 118 S.Ct. 2028 (taking no position on the question whether a person's income and wealth are relevant considerations in judging the excessiveness of a fine).
Despite Magna Carta, imposition of excessive fines persisted. The 17th century Stuart kings, in particular, were criticized for using large fines to raise revenue, harass their political foes, and indefinitely detain those unable to pay. E.g. , The Grand Remonstrance ¶¶17, 34 (1641), in The Constitutional Documents of the Puritan Revolution 1625-1660, pp. 210, 212 (S. Gardiner ed., 3d ed. rev. 1906); Browning-Ferris , 492 U.S., at 267, 109 S.Ct. 2909. When James II was overthrown in the Glorious Revolution, the attendant English Bill of Rights reaffirmed Magna Carta's guarantee by providing that "excessive Bail ought not to be required, nor excessive Fines imposed; nor cruel and unusual Punishments inflicted." 1 Wm. & Mary, ch. 2, § 10, in 3 Eng. Stat. at Large 441 (1689).
Across the Atlantic, this familiar language was adopted almost verbatim, first in the Virginia Declaration of Rights, then in the Eighth Amendment, which states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."
Adoption of the Excessive Fines Clause was in tune not only with English law; the Clause resonated as well with similar colonial-era provisions. See, e.g. , Pa. Frame of Govt., Laws Agreed Upon in England, Art. XVIII (1682), in 5 Federal and State Constitutions 3061 (F. Thorpe ed. 1909) ("[A]ll fines shall be moderate, and saving men's contenements, merchandize, or wainage."). In 1787, the constitutions of eight States-accounting for 70% of the U.S. population-forbade excessive fines. Calabresi, Agudo, & Dore, State Bills of Rights in 1787 and 1791, 85 S. Cal. L. Rev. 1451, 1517 (2012).
An even broader consensus obtained in 1868 upon ratification of the Fourteenth Amendment. By then, the constitutions of 35 of the 37 States-accounting for over 90% of the U.S. population-expressly prohibited excessive fines. Calabresi & Agudo, Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868, 87 Texas L. Rev. 7, 82 (2008).
Notwithstanding the States' apparent agreement that the right guaranteed by the Excessive Fines Clause was fundamental, abuses continued. Following the Civil War, Southern States enacted Black Codes to subjugate newly freed slaves and maintain the prewar racial hierarchy. Among these laws' provisions were draconian fines for violating broad proscriptions on "vagrancy" and other dubious offenses. See, e.g. , Mississippi Vagrant Law, Laws of Miss. § 2 (1865), in 1 W. Fleming, Documentary *689 History of Reconstruction 283-285 (1950). When newly freed slaves were unable to pay imposed fines, States often demanded involuntary labor instead. E.g. , id. § 5; see Finkelman, John Bingham and the Background to the Fourteenth Amendment, 36 Akron L. Rev 671, 681-685 (2003) (describing Black Codes' use of fines and other methods to "replicate, as much as possible, a system of involuntary servitude"). Congressional debates over the Civil Rights Act of 1866, the joint resolution that became the Fourteenth Amendment, and similar measures repeatedly mentioned the use of fines to coerce involuntary labor. See, e.g. , Cong. Globe, 39th Cong., 1st Sess., 443 (1866); id., at 1123-1124.
Today, acknowledgment of the right's fundamental nature remains widespread. As Indiana itself reports, all 50 States have a constitutional provision prohibiting the imposition of excessive fines either directly or by requiring proportionality. Brief in Opposition 8-9. Indeed, Indiana explains that its own Supreme Court has held that the Indiana Constitution should be interpreted to impose the same restrictions as the Eighth Amendment. Id. , at 9 (citing Norris v. State , 271 Ind. 568, 576, 394 N.E.2d 144, 150 (1979) ).
For good reason, the protection against excessive fines has been a constant shield throughout Anglo-American history: Exorbitant tolls undermine other constitutional liberties. Excessive fines can be used, for example, to retaliate against or chill the speech of political enemies, as the Stuarts' critics learned several centuries ago. See Browning-Ferris , 492 U.S., at 267, 109 S.Ct. 2909. Even absent a political motive, fines may be employed "in a measure out of accord with the penal goals of retribution and deterrence," for "fines are a source of revenue," while other forms of punishment "cost a State money." Harmelin v. Michigan , 501 U.S. 957, 979, n. 9, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (opinion of Scalia, J.) ("it makes sense to scrutinize governmental action more closely when the State stands to benefit"). This concern is scarcely hypothetical. See Brief for American Civil Liberties Union et al. as Amici Curiae 7 ("Perhaps because they are politically easier to impose than generally applicable taxes, state and local governments nationwide increasingly depend heavily on fines and fees as a source of general revenue.").
In short, the historical and logical case for concluding that the Fourteenth Amendment incorporates the Excessive Fines Clause is overwhelming. Protection against excessive punitive economic sanctions secured by the Clause is, to repeat, both "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." McDonald , 561 U.S., at 767, 130 S.Ct. 3020 (internal quotation marks omitted; emphasis deleted).
II
The State of Indiana does not meaningfully challenge the case for incorporating the Excessive Fines Clause as a general matter. Instead, the State argues that the Clause does not apply to its use of civil in rem forfeitures because, the State says, the Clause's specific application to such forfeitures is neither fundamental nor deeply rooted.
In Austin v. United States , 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), however, this Court held that civil in rem forfeitures fall within the Clause's protection when they are at least partially punitive. Austin arose in the federal context. But when a Bill of Rights protection is incorporated, the protection applies "identically to both the Federal Government and the States."
*690 McDonald , 561 U.S., at 766, n. 14, 130 S.Ct. 3020. Accordingly, to prevail, Indiana must persuade us either to overrule our decision in Austin or to hold that, in light of Austin , the Excessive Fines Clause is not incorporated because the Clause's application to civil in rem forfeitures is neither fundamental nor deeply rooted. The first argument is not properly before us, and the second misapprehends the nature of our incorporation inquiry.
A
In the Indiana Supreme Court, the State argued that forfeiture of Timbs's SUV would not be excessive. See Brief in Opposition 5. It never argued, however, that civil in rem forfeitures were categorically beyond the reach of the Excessive Fines Clause. The Indiana Supreme Court, for its part, held that the Clause did not apply to the States at all, and it nowhere addressed the Clause's application to civil in rem forfeitures. See 84 N.E.3d 1179. Accordingly, Timbs sought our review of the question "[w]hether the Eighth Amendment's Excessive Fines Clause is incorporated against the States under the Fourteenth Amendment." Pet. for Cert. i. In opposing review, Indiana attempted to reformulate the question to ask "[w]hether the Eighth Amendment's Excessive Fines Clause restricts States' use of civil asset forfeitures." Brief in Opposition i. And on the merits, Indiana has argued not only that the Clause is not incorporated, but also that Austin was wrongly decided. Respondents' "right, in their brief in opposition, to restate the questions presented," however, "does not give them the power to expand [those] questions." Bray v. Alexandria Women's Health Clinic , 506 U.S. 263, 279, n. 10, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (emphasis deleted). That is particularly the case where, as here, a respondent's reformulation would lead us to address a question neither pressed nor passed upon below. Cf. Cutter v. Wilkinson , 544 U.S. 709, 718, n. 7, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) ("[W]e are a court of review, not of first view ...."). We thus decline the State's invitation to reconsider our unanimous judgment in Austin that civil in rem forfeitures are fines for purposes of the Eighth Amendment when they are at least partially punitive.
B
As a fallback, Indiana argues that the Excessive Fines Clause cannot be incorporated if it applies to civil in rem forfeitures. We disagree. In considering whether the Fourteenth Amendment incorporates a protection contained in the Bill of Rights, we ask whether the right guaranteed-not each and every particular application of that right-is fundamental or deeply rooted.
Indiana's suggestion to the contrary is inconsistent with the approach we have taken in cases concerning novel applications of rights already deemed incorporated. For example, in Packingham v. North Carolina , 582 U.S. ----, 137 S.Ct. 1730, 198 L.Ed.2d 273 (2017), we held that a North Carolina statute prohibiting registered sex offenders from accessing certain commonplace social media websites violated the First Amendment right to freedom of speech. In reaching this conclusion, we noted that the First Amendment's Free Speech Clause was "applicable to the States under the Due Process Clause of the Fourteenth Amendment." Id., at ----, 137 S.Ct., at 1733. We did not, however, inquire whether the Free Speech Clause's application specifically to social media websites was fundamental or deeply rooted. See also, e.g. , Riley v. California , 573 U.S. 373, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014) (holding, without separately considering incorporation, that States' warrantless *691 search of digital information stored on cell phones ordinarily violates the Fourth Amendment). Similarly here, regardless of whether application of the Excessive Fines Clause to civil in rem forfeitures is itself fundamental or deeply rooted, our conclusion that the Clause is incorporated remains unchanged.
* * *
For the reasons stated, the judgment of the Indiana Supreme Court is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.
It is so ordered.

The sole exception is our holding that the Sixth Amendment requires jury unanimity in federal, but not state, criminal proceedings. Apodaca v. Oregon , 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972). As we have explained, that "exception to th[e] general rule ... was the result of an unusual division among the Justices," and it "does not undermine the well-established rule that incorporated Bill of Rights protections apply identically to the States and the Federal Government." McDonald , 561 U.S., at 766, n. 14, 130 S.Ct. 3020.

"Amercements were payments to the Crown, and were required of individuals who were 'in the King's mercy,' because of some act offensive to the Crown." Browning-Ferris , 492 U.S., at 269, 109 S.Ct. 2909. "[T]hough fines and amercements had distinct historical antecedents, they served fundamentally similar purposes-and, by the seventeenth and eighteenth centuries, the terms were often used interchangeably." Brief for Eighth Amendment Scholars as Amici Curiae 12.