Ball v New York State Dept. of Health (2025 NY Slip Op 25090)

[*1]

Ball v New York State Dept. of Health

2025 NY Slip Op 25090

Decided on April 14, 2025

Supreme Court, Schoharie County

Marcelle, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on April 14, 2025
Supreme Court, Schoharie County

Justin Ball, Petitioner,

against
The New York State Department of Health, Respondent.

Index No. 2024-469

Pinksy Law Group PLLC, Syracuse, NY
(Bradley M. Pinksy, Esq. of counsel) for Petitioner
Letitia James, Attorney General, Albany, NY (Erin P. Mead, Esq. of counsel) for Respondent

Thomas Marcelle, J.[FN1]

Petitioner Justin Ball (Ball), an emergency medical technician (EMT), responded to a call for help; and trouble soon began. What happened, at least according to Respondent Department of Health's (DOH) telling, is a disturbing story.

A 63-year-old man had fallen and couldn't get up. Ball believed that the patient was faking. As a result, he lacked any modicum of sympathy. Instead, Ball heaped scorn and ridicule upon the patient. Further, he provided little assistance for the patient's efforts to get down the stairs and into the ambulance. And what assistance he did provide was physically rough. The patient, who was unsteady and moved with great difficulty, injured himself getting to and entering the ambulance.
Upon arriving at the hospital, it turned out the patient was not feigning sickness; he was quite ill. Ball quickly realized that his mistreatment of the patient might spell trouble for him. So, he decided to secretly record a conversation with the patient where he attempted to cajole the patient into casting Ball's actions in a favorable light. The gambit failed. Upon a complaint by [*2]the patient outlining the above allegations, DOH lodged charges against Ball.[FN2]

DOH set in motion the bureaucratic machinery to fine Ball and to revoke his license. DOH scheduled a hearing; but Ball did not like this forum. Instead of adjudication by DOH, Ball wants a jury to decide if he did these horrid things. Accordingly, he commenced this action asking the court to declare that DOH's administrative hearing would violate his right to a civil jury trial (US Const, 7th Amend).
Now, the Seventh Amendment provides, in pertinent part, that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." Thus, the Amendment contains a dual threshold before a person may invoke its protections: (1) the suit must sound in the common law and (2) the potential judgment must exceed $20.
Ball argues that he easily crosses this constitutional threshold. His argument unfolds like this: the charges against him are, in essence, common law torts and if a factfinder determines that he engaged in the alleged tortious conduct, he would be liable for thousands of dollars in penalties together with the forfeiture of his license, which exceeds the $20 minimum imposed by the Amendment.
DOH disagrees. It maintains that Ball has no Seventh Amendment right because the Amendment does not apply to the States. Moreover, and in the alternative, DOH argues that in any event the Seventh Amendment would not apply in the context of public health. Therefore, DOH wants the case dismissed.
I. Incorporation
To begin, a prerequisite to Ball's claim is that DOH must be subject to the Seventh Amendment's requirements. In general, through the process known as selective incorporation, the Supreme Court has required the States to obey most of the Bill of Rights. In fact, the Seventh Amendment is an orphan; it is the lone component of the Bill of Rights that has yet to be made applicable to the States via the Due Process Clause (US Const, 14th Amend, cl 1).[FN3]

The test to determine if a right is protected by the Due Process Clause is simple. The right must be "fundamental to our scheme of ordered liberty," or "deeply rooted in this Nation's history and tradition" (Timbs v Indiana, 586 US 146, 150 [2019]). Ball claims that the Seventh Amendment meets this standard.
Ball argues that the historical record reveals that civil jury trials are fundamental to, and deeply rooted in, our Nation's design to ensure liberty and justice. Indeed, "the most transcendent privilege which any [citizen] can enjoy or wish for, that he cannot be affected, either in his property, his liberty, or his person, but . . . [upon the consent] of his neighbors" (Mitchell v Harmony, 54 US 115, 142—43 [1851]). Therefore, Ball concludes the Seventh Amendment, like every other clause of the Bill of Rights, applies to the States; hence, its requirements bind DOH.
DOH disagrees and answers with a barrage of counter arguments. DOH grounds its defense in two propositions: (1) the framers never intended the Bill of Rights, including the Seventh Amendment, to bind or restrict the States; and (2) the United States Supreme Court has not made the Seventh Amendment applicable to the States. From this foundation, DOH maintains that this court is precluded from analyzing whether DOH (a state agency) must obey the Seventh Amendment.

A.
Now, DOH is correct that the Seventh Amendment's framers never envisioned that the Amendment would apply to the States. But that is so for the entire Bill of Rights. As Chief Justice John Marshall explained, the first eight Amendments to the Constitution were added in response to Anti-Federalists' concerns about the federal government's power. To that point, if "the framers of these amendments [had] intended them to be limitations on the powers of the state governments . . . they would have declared this purpose in plain and intelligible language" (Barron ex rel. Tiernan v Mayor of Baltimore, 32 US 243, 250 [1833]). And since no such language existed in the Constitution at its adoption, accordingly, as originally conceived, the Bill of Rights neither imposed burdens nor placed confines upon the States.
And if the Constitution had been frozen in 1787, DOH would prevail. But the Constitution did not remain static, nor could it. The Declaration of Independence's magnificent proclamation that all men are endowed by their Creator with inalienable rights and the abhorrent practice of slavery were irreconcilable. As Abraham Lincoln presciently said, "no man is good enough to govern another man, without that other's consent. I say this is the leading [*3]principle—the sheet anchor of American republicanism ... . Now the relation of masters and slaves is, pro tanto, a total violation of this principle" (Lincoln, Speech at Peoria, Ill [October 16, 1854] [reprinted in 2 Collected Works of Lincon 266 [Basher ed 1953]).
In 1860, the inexorable collision course came to a head. Lincoln's election as President and Republican control of Congress forecasted slavery's doom. The Southern States, in an effort to maintain that institution, seceded from the Union. This act of rebellion sparked a terrible civil war. President Lincoln won the war, preserved the Republic, and ended slavery.
To ensure that slavery never darkened these United States again and to extend the promises of liberty to all Americans, the Constitution was amended to add the Thirteenth, Fourteenth and Fifteenth Amendments (Civil Rights Cases, 109 US 3, 10 [1883]). At issue here is the first section of the Fourteenth Amendment. That section commands that
"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws" (US Const 14 Amend, sec 1).
These guarantees compelled the former confederate states (and indeed every state) to honor the rights of all persons equally (Students for Fair Admissions, Inc. v President & Fellows of Harvard Coll, 600 US 181, 231 [2023] [Thomas, J., concurring]). The exact rights which the States had to honor stirred a great debate (Duncan v Louisiana, 391 US 145 [1968]). This debate remains unsettled with respect to the Seventh Amendment (McDonald v City of Chicago, Ill., 561 US 742, 765, n 13 [2010]).
DOH disagrees, noting that the Supreme Court has already decided that the Seventh Amendment does not apply to the Staes. True: the Supreme Court has held that "[a] trial by jury in suits at common law pending in the State courts is not . . . a privilege or immunity of national citizenship, which the States are forbidden by the Fourteenth Amendment to abridge" (Walker v Sauvinet, 92 US 90, 92 [1875]). Moreover, as DOH notes, and correctly so, Walker remains good law. 
Now, DOH surmises that because Walker remains good law, this court must follow it: "[if a precedent of the Supreme] Court has direct application in a case yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls" (Rodriguez de Quijas v Shearson/Am. Express, Inc., 490 US 477, 484 [1989]).
Walker, however, lacks direct application to this case. The issue here is not whether a civil jury trial is a privilege or immunity of national citizenship. Rather, the question is whether a civil jury trial is a component of substantive due process—an issue that Walker never addressed. In fact, it was impossible for the Walker Court to have done so. This is because "governing decisions regarding . . . the Seventh Amendment's civil jury requirement [e.g., Walker] long predate the era of selective incorporation through the due process clause" (McDonald, 561 US at 765, n 13). 
Thus, Walker only binds this court if Privileges or Immunities and Due Process Clauses can be collapsed into an identical analysis. But they cannot. For a right to be protected by the Privileges or Immunities Clause, it must fall within a narrow category of rights (Slaughter-[*4]House Cases, 83 US 36 [1873]).[FN4]
By contrast, for a substantive right to be protected by the due process clause, it must be "fundamental to our scheme of ordered liberty," and/or "deeply rooted in this Nation's history and tradition" (Timbs, 586 US at 150).
These tests are different. As the Supreme Court has explained, the Due Process and the Privileges or Immunities Clauses present different questions requiring different analytical frameworks (McDonald, 561 US at 759 & 764, n 11). Therefore, the Privileges or Immunities Clause precedent "do[es] not preclude [a court] from considering whether the Due Process Clause of the Fourteenth Amendment makes [an] Amendment . . . binding on the States" (Id. at 758).
This conclusion makes sense. Not deciding an issue is conceptually different than rejecting it. Moreover, in the converse situation, when a prior Supreme Court opinion "addresse[s] the Due Process Clause, its Fourteenth Amendment ruling does not bind [a court where] the proper question [ ] is the scope of the Privileges or Immunities Clause" (Ramos v Louisiana, 590 US 83, 139 [2020] [Thomas, J., concurring]). Thus, Walker sheds no light on (let alone controls) whether the Due Process Clause incorporates the Seventh Amendment.[FN5]

B.
Undeterred by Walker's precedential limitation, DOH argues that in the 150 years since Walker, no court has applied the Seventh Amendment to the States. DOH maintains that in the face of this silence, the court lacks the capacity to address the incorporation issue. As best the court can decipher, DOH believes the question of the Seventh Amendment's enforceability against the States is a matter reserved to the United States Supreme Court or perhaps an inferior federal court. That is, only a federal court may incorporate a right as part of the Fourteenth Amendment.
Such a position is at odds with the Constitution. To begin, the United States Constitution is the supreme Law of the Land (US Const, art VI, cl 2) which means that a state court must [*5]resolve questions that arise under it:
"Federal law is enforceable in state courts . . . because the Constitution and laws passed pursuant to it are as much laws in the States as laws passed by the state legislature. The Supremacy Clause makes those laws the supreme Law of the Land, and charges state courts with a coordinate responsibility to enforce that law according to their regular modes of procedure. The laws of the United States are laws in the several States, and just as much binding on the citizens and courts thereof as the State laws are.... The two together form one system of jurisprudence, which constitutes the law of the land for the State; and the courts of the two jurisdictions are not foreign to each other, nor to be treated by each other as such, but as courts of the same country, having jurisdiction partly different and partly concurrent" (Howlett v Rose, 496 US 356, 367 [1990]).
In short, a state court may not skirt a federal question properly before it. To the contrary, "[t]he existence of the jurisdiction creates an implication of duty to exercise it" (Howlett, 496 US at 369—70). Thus, a "New York [court] is not at liberty to shut the courthouse door to federal claims" (Haywood v Drown, 556 US 729, 740 [2009]). Therefore, not only can this court decide the federal constitutional issue; it must.
This conclusion accords with Third Department precedent. In 1996, it was an open question whether the Eighth Amendment's Excessive Fine Clause was applicable to the States (Browning—Ferris Industries of Vt., Inc. v Kelco Disposal, Inc., 492 US 257, 276, n 22 [1989]). Nevertheless, the Third Department did not lay paralyzed for want of direction from the Supreme Court. Rather, the Third Department, by its own authority, incorporated the Excessive Fines Clause as part of due process and made it applicable in New York (Att'y-Gen. of State of NY v One Green 1993 Four Door Chrysler, 217 AD2d 342, 345 [3d Dept 1996] lv denied 88 NY2d 841 [1996]).[FN6]
The precedent speaks volumes here.
So, without binding authority on whether the Seventh Amendment is a component of due process, the question is open (Curtis v Loether, 415 US 189, 192, n 6 [1974]). Therefore, the court must examine and answer it.

 C.
Due process has two aspects—procedural and substantive. Procedural due process affords a person the opportunity to be heard "at a meaningful time and in a meaningful manner" when the government attempts to deprive him of life, liberty, or property (Hamdi v Rumsfeld, 542 US 507, 533 [2004]). A jury trial is not required to ensure procedural due process. And the Supreme Court long ago said so (Walker, 92 US at 92-93).[FN7]
Accordingly, a trial by jury in civil [*6]matters is not essential to procedural due process.
But this case involves substantive due process. Substantive due process cares not about the type of hearing provided; rather, a substantive due process analysis queries whether the government may deprive a person from exercising a right (Washington v Glucksberg, 521 US 702, 719 [1997]). That is, the substantive component "forbids the government [from] infring[ing] certain fundamental liberty interests at all, no matter what process is provided" (Reno v Flores, 507 US 292, 302 [1993] [emphasis in the original]).
Accordingly, the question naturally arises, what rights does substantive due process protect? As the Supreme Court has instructed, it protects those rights which are either "fundamental to our scheme of ordered liberty," or "deeply rooted in this Nation's history and tradition" (McDonald, 561 US at 767). Therefore, substantive due process, in this context, obligates a careful historical examination of civil jury trials in America, to which the court now turns.
History on the subject is plentiful. Civil juries date back to America's earliest days. The protections afforded by a civil jury trial were planted and took root immediately in the colonies. Take Massachusetts, New Jersey, and Pennsylvania:
"The Plymouth Bay colony enshrined the jury trial in 1623. In the 1641 Massachusetts Body of Liberties, describes . . . essential rights of the common law tradition . . . [to] include[] the right to a [civil] jury trial. Similarly, the 1677 Concessions and Agreements of West New Jersey decreed: [N]o Proprietor, freeholder or inhabitant of the said Province of West New Jersey, shall be deprived . . . of estate, property or any ways hurt in his or their privileges, freedoms or of all causes, civil and criminal, shall be heard and decided by [a jury] . . . . [And in 1681] Quaker William Penn . . . recognized certain rights of the inhabitants of his province in the Pennsylvania Frame of Government . . . [which] included the common law right of trial by a jury" (J Wright, Remember the Alamo: The Seventh Amendment of the United States Constitution, the Doctrine of Incorporation, and State Caps on Jury Awards, 45 S Tex L Rev 449, 500 [2004] [emphasis added]).
Significantly, the colonists took a hostile attitude when the mother country interfered with trial by jury. Indeed, "the right of trial by jury was held in such esteem by the colonists that its deprivation at the hands of the English was one of the important grievances leading to the break with England" (Parklane Hosiery Co. v Shore, 439 US 322, 340 [1979] [Rehnquist, J., dissenting).
As the historical record elucidates, the deprivation of juries included civil matters. When England began evading civil juries "by siphoning adjudications to juryless admiralty, vice admiralty, and chancery courts, Americans condemned Parliament for subverting the rights and liberties of the colonists" (Sec. & Exch. Comm'n v Jarkesy, 603 US 109, 121 [2024]).
Moreover, a year prior to the Declaration of Independence which charged King George with denying Americans "the benefits of trial by jury" (The Declaration of Independence ¶ 20, [US 1776]), the Second Continental Congress passed a resolution lamenting the deprivation of "the accustomed and inestimable privilege of trial by jury, in cases affecting . . . property" (T [*7]Jefferson & J Dickinson, Declaration of the Causes and Necessity of Taking Up Arms [Philadelphia, Continental Congress 1775] [reprinted in 1 The Papers of Thomas Jefferson 213 [Boyd ed] [1950]).
After our Founding Fathers secured our independence from insufferable tyranny, and after the Articles of Confederation had failed the new nation, the need for a federal government became obvious (Torres v Texas Dep't of Pub. Safety, 597 US 580, 591 [2022]). The Founding Fathers convened to draft a constitution for a vigorous yet limited federal authority (PennEast Pipeline Co., LLC v New Jersey, 594 US 482, 508 [2021]).
As a condition of acceptance of this federal authority, the Anti-Federalists demanded an explicit guarantee that the new federal government would not exercise power in such a way as to be destructive of citizens' inalienable rights. Thus, essential to the adoption of the Constitution was the inclusion of the Bill of Rights which secured, among other liberties, the maintenance of civil jury trials (Maxwell v Dow, 176 US 581, 607-608 [1900]).
The civil jury trial guarantee was not just confined to trespass by the federal government. So foundational to justice were civil juries that all twelve of the States that wrote constitutions and bills of rights between 1776 and 1791 (including New York) protected the right to a civil jury trial from being abridged by the government (S Calabresi, S Agudo, and K Dore, State Bills of Rights in 1787 and 1791: What Individual Rights Are Really Deeply Rooted in American History and Tradition?, 85 S Cal L Rev 1451, 1510-11 [2012]). Interestingly, "[t]he right to trial by jury was probably the only one universally secured by the first American state constitutions" (L Levy, Legacy of Suppression: Freedom of Speech and Press in Early American History 281 [Belknap Press 1960]).
Additionally, one of the first acts of Congress was to preserve civil juries in all United States territories. In particular, the Ordinance of 1787, organizing the Northwest Territory, secured for its inhabitants trial by jury, including in civil matters (Northwest Ordinance, art 2 [1787]; Webster v Reid, 52 US 437, 453 [1850]).
As time marched forward, and as new states were admitted to the Union, they guaranteed that their citizens would enjoy the right to jury trials in civil cases. At the time of adoption of the Fourteenth Amendment, thirty-six out of thirty-seven states provided jury trials in civil or common law cases (S Calabresi and S Agudo, Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?, 87 Tex L Rev 7, 77 [2008]).
Importantly, the framers of the Fourteenth Amendment intended that the Bill of Rights apply to the States to protect the newly freed people—or so the Congressional record indicates. Indeed, "the record of these debates has been combed . . . [and they] support the conclusion that § 1 [of the Fourteenth Amendment] was understood to incorporate the Bill of Rights against the State" (McDonald, 561 US at 828 [Thomas, J., concurring]).
Highly relevant to this case is that civil juries were critical to protect property; "particularly in states that did not fully recognize the rights of freed people" (S Thomas, Nonincorporation: The Bill of Rights After McDonald v Chicago, 88 Notre Dame L Rev 159, 193 [2012]). "Without the ability to bring a suit with a jury trial right against states and individuals for violation of their property rights, property rights for freed people could be illusory" (Id.).
As America entered into the twentieth century, the guarantee of a jury in civil cases remained a cornerstone of justice. As the Supreme Court noted: "[the right to civil juries] is of [*8]such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right . . . should be scrutinized with the utmost care" (Dimick v Schiedt, 293 US 474, 486—87 [1935]). And in 2024, more than four hundred years since those intrepid settlers of the Plymouth Bay colony enshrined the right to a jury trial, the Supreme Court affirmed the sacrosanct place that civil juries hold by recalling that "every encroachment upon [civil jury trials] has been watched with great jealousy" (Jarkesy, 603 US at 122).

C.
Although an unwavering four-hundred-year history of protection of civil jury trials may seemingly render it "fundamental to our scheme of ordered liberty," and/or "deeply rooted in this Nation's history and tradition" (McDonald, 561 US at 767), DOH nevertheless resists this proposition. It offers several counter arguments.
Initially, DOH notes that civil juries, unlike criminal juries, were not included in the Constitution (US Const, art III, § 2). This omission, as DOH sees it, moderates the importance of civil juries. Decidedly, DOH breaks out Alexander Hamilton who thought little of civil juries: "I must acknowledge that I cannot readily discern the inseparable connection between the existence of liberty, and the trial by jury in civil cases and therefore, the right to civil juries need not be protected by the Constitution" (Hamilton, Federalist No. 83).
The Anti-Federalists were not impressed, and they took exception. In fact, "[o]ne of the strongest objections originally taken against the Constitution of the United States was the want of an express provision securing the right of trial by jury in civil cases" (Parsons v Bedford, 28 US 433, 446 [1830]). Patrick Henry of Virginia, a lawyer, and no less of a patriot than Hamilton, expressed the general conviction of the people of the Thirteen States when he said, "[t]rial by jury is the best appendage of freedom. We are told that we are to part with that trial by jury with which our ancestors secured their lives and property. I hope we shall never be induced, by such arguments, to part with that excellent mode of trial" (3 Elliott's Debates 324, 544 [cleaned up]).[FN8]

Hamilton himself acknowledged the fierce opposition to leaving civil jury trials unprotected: "The objection to the plan of the convention, which has met with most success in this State [i.e., New York], and perhaps in several of the other States, is that relative to the want of a constitutional provision for the trial by jury in civil cases" (Hamilton, Federalist No. 83). And as it turned out, "only by promising the Seventh Amendment did the Federalists secure adoption of the Constitution in several of the state ratification debates" (Jarkesy v Sec. & Exch. Comm'n, 34 F4th 446, 452, n 3 [5th Cir 2022] aff'd, 603 US 109 [2024]). When the Anti-Federalists extracted the Seventh Amendment in exchange for ratification, it meant that Hamilton's views on civil juries had been roundly rejected. Thus, Hamilton's losing argument does not define the importance of civil juries, and consequently, the court is unpersuaded by it. 
DOH moves from Hamilton to Cardozo. The great justice did not hold criminal jury trials in high regard:
"The right to trial by jury and the immunity from prosecution except as the result of an indictment may have value and importance. Even so, they are not of the very essence of a scheme of ordered liberty. To abolish them is not to violate a principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" (Palko v State of Connecticut, 302 US 319, 325 [1937]).
DOH seizes on Justice Cardozo's belief that criminal jury trials are not of fundamental importance. DOH reasons that if criminal jury trials are not rooted in the traditions of our people, then certainly, civil jury trials are not. This would be a fantastic argument if not for the fact that Cardozo's view failed the test of time. In 1969, the Supreme Court abrogated Palko. The court bluntly noted that Palko's "approach to basic constitutional rights . . . ha[s been] rejected" (Benton v Maryland, 395 US 784, 794 [1969]). Thus, the court finds Justice Cardozo's discredited view concerning juries unconvincing.
Next, DOH notes that a litigant does not get a jury trial in all civil cases—most notably cases arising in equity and admiralty. This is true, but hardly makes the right to a civil jury trial unique among its cousins in the Bill of Rights. Constitutional rights tend not to be absolute but rather riddled with exceptions.
For example, the First Amendment's free speech guarantee has exceptions for fighting words (Chaplinsky v New Hampshire, 315 US 568 [1942]), true threats (Counterman v Colorado, 600 US 66 [2023]), obscenity (Miller v California, 413 US 15 [1973]), and defamation (New York Times Co. v Sullivan, 376 US 254 [1964]). The Second Amendment right to possess a gun has exceptions for the mentally ill (D.C. v Heller, 554 US 570, 626 [2008]), dangerous individuals (United States v Rahimi, 602 US 680 [2024]), and sensitive places (New York State Rifle & Pistol Assn, Inc. v Bruen, 597 US 1, 30 [2022]). The Fourth Amendment's warrant requirement makes exceptions for searches incident to arrest (Chimel v California, 395 US 752 [1969]), automobiles searches (Carroll v United States, 267 US 132 [1925]), administrative searches (Marshall v Barlow's, Inc., 436 US 307 [1978]), inventory searches (Colorado v Bertine, 479 US 367 [1987]), and the common law right of inquiry (a/k/a "stop and frisk") (Terry v Ohio, 392 US 1 [1968]).
As a general principle, "[i]n considering whether the Fourteenth Amendment incorporates a protection contained in the Bill of Rights, we ask whether the right guaranteed—not each and every particular application of that right—is fundamental or deeply rooted" (Timbs, 586 US at 156). To the contrary, exceptions to constitutional rights define the scope of the right; they do not eliminate their fundamental nature.
There is nothing so exceptional about the exceptions to civil jury trials that shakes the following sturdy proposition: one of the best examples of the "clauses of the Constitution which guarantee[s] and safeguard[s] the fundamental rights and liberties of the individual [is] the Seventh Amendment[ ], which guarantee[s] the right of trial by jury" (Continental Ill. Nat'l Bank & Trust Co. v Chicago, Rock Island & Pacific Ry. Co., 294 US 648, 669 [1935]). Therefore, the court finds that even though civil juries are not available in every type of civil action, it does not reduce the fundamental nature of the right.
Next, DOH argues the original states had different jury practices, which indicates a lack of consensus on what exactly a right to a civil jury trial meant. It is true, in 1787, states had [*9]divergent protections for civil jury trials. But the same could be said of every other amendment contained in the Bill of Rights.
For example, while the First Amendment prohibited Congress from establishing a religion, in 1787, many states had an established religion.[FN9]
Likewise, many states in 1787 took different approaches to firearms (A Winkler, Scrutinizing the Second Amendment, 105 Mich L Rev 683, 711—712, 716—726 [2007] [reviewing the states different approaches to gun laws]). Yet the various approaches states took to establishment of religion and firearms did not prevent the Supreme Court from concluding that anti-establishment or a citizen's right to keep and bears arms were applicable to the States.
Rather, the Nation's toleration of divergent practices regarding fundamental liberties ended with the Civil War and the adoption of the Fourteenth Amendment. The reason that the States must now honor the Bill of Rights is precisely because some states had constricted rights more than allowed by the United States Constitution. Therefore, it is no longer a defense to say that states have or had more limited rights than those mandated by the Constitution. Thus, DOH's argument on this score falls limp.
Finally, DOH cites a 1972 district court case from Louisiana—Louisiana being the only state where the right to a civil jury was not protected at the time of the adoption of the Fourteenth Amendment (S Calabresi, 87 Tex L Rev at 77). The case is strange. It does not look at America's history and tradition but focuses on other countries' civil jury practices. The odd practice of Louisiana civil law and the district court's justification of it by citing legal standards in foreign lands are inconsistent with the standards set by the Supreme Court (see McDonald, 561 US at 781—82 [calling the use of foreign law to define our citizen's constitutional right "stunning" and against "the long-established standard [the court has] appl[ied] in incorporation cases"]). The case is so off beat that it has no gravitas here.
Ultimately, DOH's effort to diminish the preeminence of civil jury trials fail. Its reasoning relies on rejected views, inapposite case law or cases that long predated the era of incorporation. After all is said, DOH's argument is just a plea to disregard four hundred years of history, reject more than a half century of incorporation precedent and travel backwards to a pre-civil war era. The court cannot, consistent with its oath, do that.
The court concludes and holds that the Seventh Amendment is both fundamental to our scheme of ordered liberty and deeply rooted in this Nation's history and tradition. Therefore, the Seventh Amendment applies to the States through the Due Process Clause.

II. A legal action with a legal remedy requires a jury trial
Having found that the Seventh Amendment applies to the States, the question becomes straightforward: does the Amendment entitle Ball to a jury trial?
Ball takes the affirmative position. He asserts that his supposed misconduct mirrors common law torts which are triable in courts of law. Moreover, he argues that the imposition of monetary penalties and the forfeiture of his license are legal remedies. Accordingly, he concludes that since DOH's proceeding against him is legal and not equitable in nature; the [*10]Seventh Amendment therefore affords him a jury trial.
DOH offers several opposing arguments. Initially, DOH says its administrative proceeding against Ball has nothing to do with the common law. DOH notes that an EMT license is a statutory creation and that licensure schemes have no common law counterpart. In particular, a proceeding to penalize a licensee for a statutory violation never existed at common law. Therefore, according to DOH, the Seventh Amendment is inapplicable.
DOH's line of argument is incorrect (Parson, 28 US at 447). Although the proceeding against Ball arises under the Public Health Law (PHL), "whether [a] claim is statutory is immaterial to [a Seventh Amendment] analysis" (Jarkesy, 603 US at 122). The right to a civil jury trial is not limited to common law forms of action (Curtis, 415 US at 193). Instead, "the Framers used the term common law in the [Seventh] Amendment in contradistinction to equity [or] admiralty . . . . Thus, the Amendment therefore embraces all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form which they may assume" (Jarkesy, 603 US at 122).
Consequently, that this case arises from a statutory violation is uninformative to the Seventh Amendment inquiry. Rather, a proper Seventh Amendment analysis explores both the nature of the claim and the nature of the remedy (Id. at 122-123).
Turning first to the nature of the claim, DOH has levied seven counts against Ball. They all correspond to a common law tort: (1) physical abuse of a patient is a battery (Waxter v State, 33 AD3d 1180, 1182 [3d Dept 2006]); (2-3) psychological abuse of a patient amounts to intentional infliction of emotional distress (see Howell v New York Post Co., 81 NY2d 115, 120 [1993] [citing to Professor William Prosser's tracing the common law origins of this tort]); (4-6) neglect, negligence and incompetence doubtlessly sound in basic common law negligence (Knight v State, 127 AD3d 1435, 1435 [3d Dept 2015]); and (7) breach of patient confidentiality, which is a statutory duty owed to the patient, at minimum, constitutes negligence per se (Howell v City of New York, 39 NY3d 1006, 1026, n 11 [2022] [Wilson, J, dissenting]). Thus, the wrongdoing of which Ball is accused resembles common law torts. Consequently, the first factor suggests that Ball is entitled to a jury trial.
The second factor, and the more important aspect to determine the applicability of the Seventh Amendment, is the type of remedy sought (Granfinanciera, S.A. v Nordberg, 492 US 33, 42 [1989]). Here, DOH seeks two remedies: (1) taking Ball's money through monetary fines and (2) taking his EMT license via revocation. The question is whether these remedies are legal or equitable in nature.
Not much time need be spent on the fines—Jarkesy decided that issue. "Civil [fines are] . . . a type of remedy at common law that could only be enforced in courts of law" (Jarkesy, 603 US at 122—23). This has been the law in New York long before Jarkesy (see Fire Dep't v Harrison, 2 Hilt 455 [1859] [holding that an action to recover a statutory penalty was triable by jury, and that the Legislature lacked authority to transfer such a proceeding to a court of equity]). And if fines were the only remedy that DOH sought for Ball's alleged misconduct, then, under Jarkesy, Ball would have his jury trial (Jarkesy, 603 US at 125).
But that is not the case. DOH also seeks to take Ball's EMT license. According to DOH, this relief is equitable in nature. There is an alluring surface appeal to this notion. Yet it does not seem exactly right.
It is good to remember that both the Sugar Act (4 Geo. 3, c 15 [1764]) and Stamp Act (5 Geo. 3 c 12 [1765]) allowed forfeiture of property in vice-admiralty courts as opposed to [*11]common law courts (see M Harrington, The Economic Origins of the Seventh Amendment, 87 Iowa L Rev 145, 165 [2001] [explaining this history in some detail]). Vice-admiralty courts deprived colonists of trial by civil jury—which raised the colonists' ire. For example, John Adams decried this loss of civil jury trials as a "disgrace fixed upon every American" (Id.). Thus, history suggests that before the government can confiscate property for a civil wrong, a jury, not a government official, must determine liability.
The taking of property is at stake here. To be exact, Ball has a property interest in his EMT license (see Holterman v Holterman, 3 NY3d 1, 8 [2004] [holding that "a professional license is marital property"]; see also Donk v Miller, 365 F.3d 159, 163 [2d Cir 2004] [concluding that a horse trainer possesses a property interest in his professional license]). Significantly, Ball is allowed to keep his license unless he is found to have engaged in prohibited conduct (PHL §12, 10 NYCRR § 800.16). Accordingly, "since [New York] has engendered a clear expectation of continued enjoyment of a[n EMT] license absent proof of culpable conduct, [it has created a property right]" (Barry v Barchi, 443 US 55, 65, n 11 [1979]). Therefore, the taking of Ball's EMT license is the taking of his property.
As noted long ago, "[i]t cannot be doubted that a forfeiture of property for a prohibited act is a penalty for committing the act. It is so denominated by lexicographers, and is so treated in judicial decisions . . . [and] it is a matter of public notoriety that suits for penalties have generally been tried before a jury" (Colon v Lisk, 13 AD 195, 203 [2d Dept 1897]). In fact, "[i]t is difficult to imagine how a proceeding to enforce a statutory forfeiture can resemble in any respect a suit in equity" (United States v One 1976 Mercedes Benz 280S, 618 F2d 453, 458—59 [7th Cir 1980]). No question then, taking property as a penalty is a legal remedy, not an equitable one.
In sum, in this case, any penalty hinges on proof that Ball committed torts against his patient. If liable, DOH means to confiscate Ball's property—and it makes no difference whether that property is his money or his license, both are his property. In the end, the administrative proceeding against Ball is the equivalent of a legal action with a legal remedy. Thus, the Seventh Amendment provides Ball access to a jury to determine liability.
However, even if revoking Ball's license is an equitable remedy, DOH still cannot evade a jury trial. As noted, fining Ball is a legal remedy entitling him to a jury trial (Jarkesy, 603 US at 125). Thus, his right to a jury trial cannot be impaired by adding a demand for equitable relief grounded in the same fact pattern as the legal action. Where a "legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact. The right cannot be abridged by characterizing the legal claim as incidental to the equitable relief sought" (Curtis, 415 US at 196, n 11). Therefore, even if the taking of Ball's license is an equitable remedy, it may not be used to defeat his constitutional guarantee to a jury trial (Tull v United States, 481 US 412, 425 [1987]).

III. The public rights exception is inapplicable
Finally, DOH argues that even if the Seventh Amendment grants Ball a jury trial, an exception applies that defeats this entitlement—namely, the public rights exception. The public rights exception allows the legislature to assign adjudication of public rights to an administrative agency without violating the Seventh Amendment (Jarkesy, 603 US at 127).
The public rights exception underwent a metamorphous (or at least a tailoring) in Jarkesy. In large part, Jarkesy was a spat between the majority and dissent over the breadth of the public rights exception. The Jarkesy majority defined the exception quite narrowly—noting [*12]that "[t]he public rights exception is, after all, an exception" (Id. at 131).
Jarkesy started with the basics. "If a suit is in the nature of an action at common law, then the matter presumptively concerns private rights [rather than public rights]" (Id. at 128). This is true even when government enforcement "originate[s] in a newly fashioned regulatory scheme, [because] what matters is the substance of the action, not where [the Legislature] has assigned it" (Id. at 134). And the substance of the action here is common law torts. Therefore, the legislature may not "conjure away the Seventh Amendment by mandating that traditional legal claims be ... taken to an administrative tribunal" (Granfinanciera, S.A., 492 US at 52).
Undeterred, DOH offers similar reasoning that failed the SEC. First, DOH urges that since emergency medical services are directly related to patient rights and public safety, its enforcement of the PHL constitutes enforcement of a public right. The argument fails here, as it did in Jarkesy. The PHL governs private transactions between provider and patient. In other words, DOH is penalizing Ball, via governmental sanctions, for misconduct that harmed an individual patient and not the public writ large.
Now, the only way public safety could be implicated is by preventing Ball from mistreating future patients. But of course, that goal can only be achieved after it has been determined that Ball committed a discrete past wrong—thus, making any future benefit to the public just a positive externality of sanctioning private tortious conduct. 
Second, DOH, like the SEC in Jarkesy, invokes Atlas Roofing Co. v Occupational Safety and Health Review Commission, 430 US 442 (1977). Atlas Roofing involved a federal regulatory regime (The Occupational Safety and Health Act [OSHA]) that promoted safe working conditions by employing a maze of rules. Significantly, and unlikely the case here, the government could bring an abatement action for non-compliance even if the non-compliance had yet to harm anyone—in other words, the government could seek prospective equitable relief to prevent harm from occurring (Atlas Roofing, 430 US at 445).
Now, Jarkesy adopted a cramped view of Atlas Roofing because "Atlas Roofing represents a departure from our legal traditions" (Jarkesy, 603 US at 138, n 4). Accordingly, under Atlas Roofing, administrative proceedings are constitutionally permitted only where claims are "unknown to the common law" (Id.). In so narrowing Atlas Roofing, the Supreme Court repeatedly admonished that "the public rights exception does not apply automatically whenever Congress assigns a matter to an agency for adjudication" (Id. at 139). Rather, "the Seventh Amendment does apply to novel statutory regimes, so long as the claims are akin to common law claims" (Id.). Under this standard, DOH has an insurmountable problem in its quest to claim the public rights exception because, as repeatedly noted, its enforcement proceedings must resolve matters akin to common law torts.
For similar reasons, this case is a far cry from Atlas Roofing. To begin, OSHA proceedings were given "to administrative agencies with special competence in the relevant field" (Atlas Roofing, 430 US at 455 [emphasis added]). The PHL describes and defines misconduct not in terms of inscrutable technical standards like the precise parts per million (ppms) of carbon tetrachloride (CCl4) that can be released by a solvent in a work area. Instead, the PHL rehashes common law terms of art for torts like negligence and battery. No special technical expertise is needed to discern the legal principles of negligence or the other torts constituting Ball's alleged misconduct—juries apply such legal principles across the country daily. Thus, Atlas Roofing offers no shelter for DOH.
As a last resort, DOH trollops down the same path as the SEC by making an appeal to the [*13]noble public purposes of its law. No doubt, DOH through enforcement of the PHL promotes qualified and reliable emergency medical treatment. No doubt that the public is the ultimate beneficiary of DOH's work. Indeed, one might suppose (or at least hope) that all legislative enactments ultimately benefit the public.
However, this purpose-driven argument is analogous to the one that the SEC unconvincingly made to the Supreme Court. In Jarkesy, it seemed beyond debate that Congress' efforts to punish securities fraudsters with civil penalties was done for the public's protection. Still, a law protecting consumers from illicit behaviors of government licensed securities brokers was insufficient to transfer adjudication from a jury to the government. The same is true in this case.
A law's motives or purposes, no matter how noble, are irrelevant to determining whether the Seventh Amendment can be bypassed. If it was otherwise, all the legislature would need to do is identify a public benefit from agency adjudication, invoke the public rights exception, and presto, by mere government say so, the right to a civil jury would vanish. Our Bill of Rights should not succumb to such a fate. 
DOH, like the SEC in Jarkesy, is simply penalizing someone for a past private tort. DOH's public rights exception fails to meet Jarkesy's stringent standard. And therefore, the conclusion here is the same as it was in Jarkesy; DOH may not deploy the public rights doctrine to elude Ball's constitutional right to a jury trial.[FN10]

Conclusion
In the end, here is what all the fuss is over—a jury trial is not as swift and certain as an administrative hearing. DOH may be right that honoring the Constitution will hamper and frustrate its pursuit of penalizing Ball. The Seventh Amendment may be a pain in DOH's posterior. But as it was when conceived, as it has been in practice, and as it will always be, if we maintain our vigilance, "[t]he guarantees of the Seventh Amendment will prove burdensome in some instances . . . ; as surely as the civil jury was a burden to the English governors who, in its stead, substituted the vice-admiralty court" (Parklane Hosiery Co., 439 US at 346 [Rehnquist, J., dissenting]). 
To be sure, the facts alleged make it tempting to dodge the commands of the Seventh Amendment. If Ball did everything that DOH says he did, he is deserving of punishment. However, it seems wise to recall that the Seventh Amendment exists "to protect the individuals, particularly unpopular ones. . . . While incursions on old rights may begin in cases against the unpopular, they rarely end there. The authority the government seeks . . . in this case—to penalize citizens without a jury, without an independent judge . . . contains no [] limits." (Jarkesy, 603 US at 167 [Gorsuch J., concurring]). Exactly right.
For the foregoing reasons, it is therefore,
Ordered and Declared that the Seventh Amendment to the United States Constitution (US Const, 7th Amend), as made applicable to the States through the Due Process Clause (US Const, [*14]14th Amend, cl 1) grants, affords, and entitles Petitioner JUSTIN BALL to a civil jury trial in New York State Supreme Court to determine whether he is liable for and subject to civil penalties under Public Health Law §§ 12 and 12-a and 10 NYCRR 800.16 and subject to revocation of his EMT license under 10 NYCRR § 800.16 based upon the allegations contained in Respondent NEW YORK STATE DEPARTMENT OF HEALTH's Statement of Charges against Petitioner JUSTIN BALL dated July 17, 2024; and it is further
Ordered Respondent NEW YORK STATE DEPARTMENT OF HEALTH is restrained and enjoined from doing an act inconsistent with the court's declaration.
The foregoing constitutes the Decision and Order of the court.
DATED: April 14, 2025
Thomas Marcelle
Supreme Court Justice

Footnotes

Footnote 1:For ease of reading, internal quotation marks and citations have been omitted throughout without notation.

Footnote 2:DOH issued seven charges against Ball: (1) physical abuse of a patient (10 NYCRR § 800.3 [ap][1]); (2-3) psychological abuse of a patient (10 NYCRR § 800.3 [ap][2]); (4) patient neglect (10 NYCRR § 800.3 [am]); (5) negligence (10 NYCRR § 800.3 [am]); (6) incompetence (10 NYCRR § 800.3 [al]); and (7) breach of patient confidentiality (10 NYCRR § 800.15).

Footnote 3:The First Amendment applies to the States (see Everson v Board of Ed. of Ewing, 330 US 1, 504 [1947] [Establishment Clause]; Cantwell v Connecticut, 310 US 296 [1940] [Free Exercise Clause]; De Jonge v Oregon, 299 US 353, [1937] [freedom of assembly]; Gitlow v New York, 268 US 652, [1925] [free speech]; Near v Minnesota ex rel. Olson, 283 US 697, [1931] [freedom of the press]).

The Second Amendment applies to the States (McDonald v City of Chicago, Ill., 561 US 742 [2010]).

The Third Amendment applies to the States (Engnlom v Carey, 677 F3d 957, 961 [2nd Cir 1982]).

The Fourth Amendment applies to the States (see Aguilar v Texas, 378 US 108 [1964] [warrant requirement]; Mapp v Ohio, 367 US 643 [1961] [exclusionary rule]; Wolf v Colorado, 338 US 25 [1949] [freedom from unreasonable searches and seizures]).

The Fifth Amendment applies to the States (see Benton v Maryland, 395 US 784 [1969] [Double Jeopardy Clause]; Malloy v Hogan, 378 US 1 [1964] [privilege against self-incrimination]; Chicago, B. & Q.R. Co. v Chicago, 166 US 226 [1897] [Just Compensation Clause]).

The Sixth Amendment applies to the States (see Duncan v Louisiana, 391 US 145 [1968] [trial by jury in criminal cases]; Washington v Texas, 388 US 14 [1967] [compulsory process]; Klopfer v North Carolina, 386 US 213 [1967] [speedy trial]; Pointer v Texas, 380 US 400 [1965] [right to confront adverse witness]; Gideon v Wainwright, 372 US 335 [1963] [assistance of counsel]; In re Oliver, 333 US 257 [1948] [right to a public trial]; Ramos v Louisiana, 590 US 83 [2020] [unanimous verdict for conviction]).

The Eighth Amendment applies to the States (see Robinson v California, 370 US 660, [1962] [cruel and unusual punishment]; Schilb v Kuebel, 404 US 357 [1971] [prohibition against excessive bail]; Timbs v Indiana, 586 US 146 [2019] [Excessive Fines Clause]).

Footnote 4:Privileges and immunities include such rights as:
"to come to the seat of government to assert any claim [a citizen] may have upon that government, to transact any business he may have with it, to seek its protection, to share its offices, to engage in administering its functions ... [and to] become a citizen of any State of the Union by a bonafide residence therein, with the same rights as other citizens of that State" (Slaughter-House Cases, 83 US at 79-80).
Footnote 5:The entire argument seems misplaced. All Walker said was that under Slaughterhouse the Seventh Amendment was not a privilege or immunity. From that DOH argues, in essence, that a prior Privileges or Immunities Clause decision must be reversed for a right to be incorporated under the Due Process Clause. This cannot possibly be correct. The mother of privilege or immunities decisions, Slaughterhouse, listed discrete rights. None of the rights in the Bill of Rights were on that limited list. Thus, under DOH's logic, Slaughterhouse should have prevented the incorporation of any Amendments through the Due Process Clause, unless, of course, it was overturned by the Supreme Court. Slaughterhouse remains good law. Yet, despite Slaughterhouse's vitality, the entire Bill of Rights, save the Seventh Amendment, has been incorporated.

Footnote 6:Finally, in 2019, twenty-three years after One Green 1993 Four Door Chrysler, the Supreme Court made the Excessive Fines Clause binding on the States via the Due Process Clause (Timbs, 586 US at 156). The Third Department acted (and correctly so) well in advance of any pronouncement by the Supreme Court to ensure that New York honored this basic constitutional protection.

Footnote 7:To be clear, Walker's discussion of the Due Process Clause refers to procedural due process. It could not have been otherwise because the concept of substantial due process had not yet been conceived. As noted previously, Walker "long predate[d] the era of selective incorporation through the [substantive] due process clause" (McDonald, 561 US at 765, n 13).

Footnote 8:Although Henry may not have a Broadway musical commemorating his contributions to our Nation's founding (Miranda, Hamilton: An American Musical [2015]), he did famously and compellingly set forth an altogether perfect call to arms against British oppression: "Is life so dear or peace so sweet as to be purchased at the price of chains and slavery? Forbid it, Almighty God. I know not what course others may take, but as for me, give me liberty or give me death!" (remarks in support of mobilizing Virginia's militia against the Crown [March 23, 1775, the Second Virginia Convention at St. John's Church in Richmond, Virginia] [reprinted in Gregory R. Suriano, Great American Speeches 4 [1993]).

Footnote 9:For example, Massachusetts and New Hampshire not only permitted the establishment of religion, but they also explicitly established Christianity (see Mass Const of 1780, pt 1, art III and NH Const of 1784, pt I, art VI [both authorizing government funds to support and maintain public Protestant teachers]).

Footnote 10:It should be noted that the New York Legislature has no more power than the United States Congress to override the Seventh Amendment by statute (see Malloy v Hogan, 378 US 1, 10 [1964] [holding that incorporated Bill of Rights protections "are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment"]).