STATE OF MINNESOTA

IN SUPREME COURT

A23-1544

Court of Appeals

Moore, III, J.
Dissenting, Hennesy, Procaccini, JJ.

Christopher Thigpen,

Appellant,

vs.

Filed: December 24, 2025
Office of Appellate Courts

Best Home Care LLC,

Respondent,

Department of Employment and Economic Development,

Respondent.

_____

Russell Squire, Brianna Boone, Southern Minnesota Regional Legal Services, Inc., Saint Paul, Minnesota, for appellant.

Keri A. Phillips, Katrina Gulstad, Department of Employment and Economic Development, Saint Paul, Minnesota, for respondent.

Lars Markeson, Mid-Minnesota Legal Aid, Minneapolis, Minnesota, for amicus curiae Mid-Minnesota Legal Aid.

_____

1

S Y L L A B U S

The penalty under Minnesota law for obtaining unemployment benefit overpayments through misrepresentation, set forth in Minn. Stat. § 268.18, subd. 2, does not violate the Excessive Fines Clauses of the United States and Minnesota Constitutions.

Affirmed.

O P I N I O N

MOORE, III, Justice.

Appellant Christopher Thigpen received unemployment benefits from the Department of Employment and Economic Development (DEED) for 104 weeks from March 2020 to March 2022. An unemployment law judge later determined that Thigpen had been overpaid $24,005 in standard unemployment benefits and pandemic emergency unemployment compensation, as well as $15,600 in federal pandemic unemployment benefits. The unemployment law judge concluded that these overpayments resulted from Thigpen's misrepresentation of his employment status.

Because of this determination, under Minn. Stat. § 268.18, subd. 2(a), Thigpen is now required to repay the overpayment along with a penalty of 40 percent of the amount of the overpayment. This penalty accrues interest at 1 percent per month, and under Minn. Stat. § 268.085, subd. 2(2), Thigpen is ineligible to receive any unemployment benefits while he has an outstanding balance on his misrepresentation overpayment and penalty. At the same time, under Minn. Stat. § 268.18, subd. 4(b), there is a maximum period of ineligibility for unemployment benefits of ten years, because if the outstanding balance (including penalties and interest due) is not repaid within ten years after the determination

2

of the overpayment penalty, the commissioner of DEED "must cancel the overpayment balance and any penalties and interest due."

Thigpen sought review at the court of appeals via a writ of certiorari, alleging in part that the 40 percent penalty, 1 percent monthly interest, and bar on receiving future unemployment benefits together create a punishment that violates the Excessive Fines Clauses of the United States and Minnesota Constitutions. The court of appeals, applying the three-prong test we have derived from U.S. Supreme Court jurisprudence, concluded that the statutory penalties were not unconstitutionally excessive. *Thigpen v. Best Home Care LLC*, No. A23-1544, 2024 WL 3564541, at \*3–5 (Minn. Ct. App. July 29, 2024).

Thigpen now appeals to this court. Applying the three-factor test we set forth in *State v. Rewitzer*, 617 N.W.2d 407, 413 (Minn. 2000), we conclude that because the harshness of the punishment is not grossly disproportional to the gravity of Thigpen's offense, and because the penalty under Minnesota law for unemployment benefit misrepresentation is not an outlier among punishments in Minnesota for similar offenses, or among the penalties in other states for this offense, the punishment does not violate the Excessive Fines Clauses as applied to Thigpen. We therefore affirm the decision of the court of appeals.

**FACTS**

Christopher Thigpen first applied for unemployment benefits through DEED in March 2020. Thigpen was 21 years old and living with his mother and four siblings. In Thigpen's initial application for benefits, he reported that he had held three jobs since 2018: at Home Depot, which he left on July 7, 2019; at Target, which he left on March 12, 2020;

3

and working as a personal care assistant for his mother through Best Home Care LLC (Best Home Care). Thigpen stated in his application that he was now employed by Best Home Care, making $13.25 per hour and working an average of 40 hours per week.

DEED approved Thigpen's application and began providing Thigpen unemployment benefits. For 104 weeks between March 2020 and March 2022, DEED required Thigpen to complete an online questionnaire to request continued benefits. Each week, Thigpen answered "No" to this question:

> Did you work or have a paid holiday during the reporting period listed above? This includes Full Time, Part Time, Temporary Work, Self Employment or Volunteer Work.

Thigpen also answered "No" each week to this question:

> For the time period above, did you/will you receive income from any other source that you have not already reported to us? Answer "yes" if you applied for another source of income for the period above, but have not received that income yet.

(Emphasis omitted.) Thigpen was employed through Best Home Care throughout these two years, earning between $132.50 and $576.00 per week. Notwithstanding this employment, Thigpen received unemployment benefits—a combination of standard unemployment benefits and Pandemic Emergency Unemployment Compensation[1]—from DEED during that time, receiving roughly $350 per week.[2] Throughout this period,

---

[1]  Pandemic Emergency Unemployment Compensation was authorized in Section 2107 of the federal CARES Act of 2020 to extend unemployment benefits to individuals who had exhausted their allotted weeks under state law. Pub. L. No. 116–136, 134 Stat. 281, 323 (codified as amended at 15 U.S.C. § 9025).

[2]  Thigpen was paid $370 per week in "standard" benefits starting March 22, 2020, through September 19, 2020. Thigpen received $370 per week in Pandemic Emergency

4

Thigpen also at times received Federal Pandemic Unemployment Compensation through DEED.[3]

In April 2022, DEED notified Thigpen that his unemployment account was under review. DEED provided Thigpen with a list of his wages from Best Home Care during the period in which he received benefits and asked Thigpen if the list was accurate. Thigpen confirmed the list's accuracy. Three months later, DEED notified Thigpen that he had been "overpaid unemployment benefits due to misrepresentation" and informed Thigpen that he must repay all of the overpaid benefits he had received over the previous two years, along with the 40 percent penalty required by Minn. Stat. § 268.18, subd. 2(a).[4] DEED informed Thigpen that the amount would accrue interest at 1 percent per month, and that he would be ineligible to receive any unemployment benefits until the entire overpayment and penalty was paid. *See* Minn. Stat. §§ 268.18, subd. 2b, 268.085, subd. 2(2).

Unemployment Compensation benefits from September 20, 2020, through September 4, 2021. Thigpen again received "standard" benefits starting on September 5, 2021, and he received $333 per week through March 19, 2022. Thigpen also received Federal Pandemic Unemployment Compensation: $600 per week from March 29, 2020 to July 25, 2020, and $300 per week from December 27, 2020 to September 4, 2021.

[3]    Federal Pandemic Unemployment Compensation, authorized by Section 2104 of the CARES Act, Pub. L. 116–136, 134 Stat. 281, 318 (codified as amended at 15 U.S.C. § 9023), provided for supplemental payments of $600 for weeks ending before July 31, 2020, and $300 for weeks between December 26, 2020 and September 6, 2021, for those eligible for standard unemployment benefits.

[4]    Under Minn. Stat. § 268.18, subd. 2(a), an applicant for unemployment benefits "has committed misrepresentation if the applicant is overpaid unemployment benefits by making a false statement or representation without a good faith belief as to the correctness of the statement or representation."

Thigpen appealed DEED's determination that he had been overpaid benefits as a result of misrepresentation. An unemployment law judge held three evidentiary hearings on Thigpen's appeal in September 2022 and March 2023. Thigpen's counsel stated at these hearings that "[t]he fact that Mr. Thigpen noted his Best Home Care job on his unemployment application originally is not consistent with an intent to defraud the Department." Thigpen and his mother testified that he had not intended to lie and had merely failed to understand the forms and had reported the required information to the best of his ability.

The unemployment law judge issued final decisions on Thigpen's appeal on September 21 and 22, 2023. The unemployment law judge concluded that Thigpen was overpaid unemployment insurance benefits, and that the overpayments resulted from Thigpen's misrepresentation. The unemployment law judge stated that it "is not credible that Thigpen had a good faith belief as to the correctness of his answers when filling out his payment requests." The unemployment law judge concluded that Thigpen was overpaid $24,005 in standard unemployment benefits and Pandemic Emergency Unemployment Compensation, and $15,600 in Federal Pandemic Unemployment Compensation. Under Minn. Stat. § 268.18, subd. 2, the unemployment law judge assessed Thigpen an overpayment penalty of 40 percent the amount of the overpayment.[5] The standard benefit overpayments and penalties have continued to accrue interest at a rate of

_____

[5] Because the U.S. Department of Labor directed states to apply their existing fraud-related penalties to Federal Pandemic Unemployment Compensation administered under the CARES Act, DEED likewise imposed a 40 percent penalty on those overpayments.

6

1 percent per month.[6]  Minnesota Statutes section 268.085, subdivision 2(2), bars Thigpen from collecting unemployment benefits for no more than ten years while he has an outstanding balance on the overpayment or penalties.  *See* Minn. Stat. § 268.18, subd. 4(b) ("If unemployment benefits overpaid because of misrepresentation including penalties and interest are not repaid within ten years . . . the commissioner must cancel the overpayment balance and any penalties and interest due . . . .").

Thigpen petitioned the court of appeals for a writ of certiorari.  Thigpen advanced four arguments before the court of appeals.  He argued that the unemployment law judge's decisions: (1) were unsupported by substantial evidence; (2) "failed to apply a burden of proof"; (3) denied Thigpen due process; and (4) imposed an excessive fine in violation of the Excessive Fines Clauses of the United States and the Minnesota Constitutions. *Thigpen*, 2024 WL 3564541, at *1, 3.  The court of appeals rejected each argument and affirmed the decisions of the unemployment law judge.  *Id.* at *5.  On the excessive fines claim, the court of appeals applied the three-factor test we have previously set forth and concluded that the 40 percent penalty "is proportionate to the harm caused," is "comparable and proportional to penalties for fraudulent tax returns and refunds" in Minnesota, and is "comparable and proportional to the penalties for similar offenses in other jurisdictions." *Id.* at *4–5.  The court of appeals therefore rejected Thigpen's constitutional claim.

---

[6]     Under the unemployment law judge's decisions, Thigpen owes $39,605 in unemployment benefit misrepresentation overpayments, which he must repay along with $15,842 in misrepresentation overpayment penalties.  The overpayment and penalties related to Federal Pandemic Unemployment Compensation and Pandemic Emergency Unemployment Compensation do not accrue interest.

Thigpen petitioned this court for review, and we accepted review of only one issue: Thigpen's claim under the Excessive Fines Clauses.

**ANALYSIS**

Identical clauses in the United States and the Minnesota Constitutions prohibit the state from imposing excessive fines.  Both constitutions provide: "Excessive bail shall not be required, *nor excessive fines imposed*, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII; Minn. Const. art. I, § 5 (emphasis added).  The U.S. Supreme Court has held that the protections of the Eighth Amendment's Excessive Fines Clause are incorporated against the states via the Due Process Clause of the Fourteenth Amendment. *Timbs v. Indiana*, 586 U.S. 146, 149 (2019).  This court has never held that Minnesota's Excessive Fines Clause provides any greater or lesser protections than the Eighth Amendment, and Thigpen does not argue that the Minnesota Constitution should be interpreted any differently here than the United States Constitution.

Thigpen argues that the punishment imposed under Minnesota law for unemployment benefit misrepresentation, *see* Minn. Stat. §§ 268.18, subds. 2 (2022), 2b (2024), and 268.085, subd. 2(2) (2024),[7] violates the Excessive Fines Clauses.  The constitutionality of a state statute is a question of law, which we review de novo.  *State v. Rewitzer*, 617 N.W.2d 407, 412 (Minn. 2000).  We presume that statutes are constitutional.

---

[7]     Minnesota Statutes section 268.18, subdivision 2(b) was amended in 2023 to allow an applicant 45 days, rather than 25 days, to appeal the commissioner's determination of overpayment penalty before the determination is final.  This amendment has no impact here.  All other statutory cites in this opinion are unchanged between the 2022 and 2024 versions of Minnesota Statutes unless otherwise noted.

*In re Haggerty*, 448 N.W.2d 363, 364 (Minn. 1989). The authority to declare a statute unconstitutional is one we exercise "with extreme caution and only when absolutely necessary." *Wendell v. Comm'r of Revenue*, 7 N.W.3d 405, 414 (Minn. 2024).

## A.

Before taking up the merits of Thigpen's constitutional claim, we begin by addressing a threshold question raised by the parties: which, if any, of the sanctions imposed under Minnesota law for obtaining unemployment benefit overpayments through misrepresentation implicate the Excessive Fines Clause. Thigpen alleges that three punishments imposed by two statutes for unemployment benefit misrepresentation warrant scrutiny under the clause: (1) the 40 percent payment penalty, from Minn. Stat. § 268.18, subd. 2(a); (2) the 1 percent monthly interest, from Minn. Stat. § 268.18, subd. 2b; and (3) the 10-year bar on unemployment benefit eligibility for those who owe any amount in misrepresentation overpayment penalty or accrued interest, from Minn. Stat. §§ 268.085, subd. 2(2), and 268.18, subd. 4(b).

The Excessive Fines Clause limits "the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Austin v. United States*, 509 U.S. 602, 609–10 (1993) (citation omitted) (internal quotation marks omitted). Therefore, for a sanction to warrant scrutiny under the Excessive Fines Clause, it must have two essential characteristics: (1) it must be a punishment, meaning that it is not "purely remedial," *Grashoff v. Adams*, 65 F.4th 910, 916 (7th Cir. 2023), and (2) it must be a "fine," i.e., a "cash or in-kind" payment, *Austin*, 509 U.S. at 609–610. Thigpen argues that the penalty, interest, and bar on eligibility required by these statutes constitute one collective

9

punishment for his offense of unemployment benefit misrepresentation, and that this punishment scheme triggers scrutiny under the Excessive Fines Clause.

DEED does not dispute that the 40 percent penalty and 1 percent interest implicate the Excessive Fines Clause; they require Thigpen to make payments to the government that are intended to deter and punish misrepresentation. *See Austin*, 509 U.S. at 609–10. But DEED argues that the provision prohibiting an individual from obtaining benefits while they have an outstanding balance from a misrepresentation overpayment is not a "fine," and should not factor into our analysis. DEED reasons that although the bar on eligibility may be a "punishment," it is not a "cash or in-kind payment" to the government, and thus is not relevant to Thigpen's Excessive Fines Clause claim.

The U.S. Supreme Court has not had many occasions to define what constitutes a "fine" for an Excessive Fines Clause claim. But DEED's position—that the eligibility provision is not such a fine—finds some support in the U.S. Supreme Court's excessive fines jurisprudence. For example, in *Department of Housing & Urban Development v. Rucker*, 535 U.S. 125, 136 n.6 (2002), public housing tenants evicted based on criminal activity challenged their evictions on multiple grounds, including that their eviction was an "excessive fine." The Ninth Circuit rejected this claim, and on appeal, the Supreme Court endorsed the Ninth Circuit's analysis in a footnote while resolving the case on different grounds. *Id.* The Court said it agreed with the Ninth Circuit that the case raised no "substantial . . . Excessive Fines Clause concerns," because "termination of tenancy is neither a cash nor an in-kind payment imposed by and payable to the government and

10

therefore is not subject to analysis as an excessive fine." *Id.* (citation omitted) (internal quotation marks omitted).

Thigpen instead relies on the history of the Clause laid out by the Court in *Timbs v. Indiana,* 586 U.S. 146, 152 (2019), which Thigpen argues shows that "the core of the [Excessive Fines Clause] is concerned with the creation of fines which become unpayable or so large as to deprive an individual of their livelihood." Thigpen reasons that "the eligibility bar is not separable from the penalty and interest fine because it . . . make[s] the fine more punishing, more difficult to pay back, and more burdensome to the poor." Thigpen therefore asserts that, despite not being a traditional monetary payment, the eligibility bar "must be considered, along with the other penalties" when analyzing his Excessive Fines Clause claim.

Thigpen's position on this question has some merit. In recently holding that the Excessive Fines Clause is incorporated against the states via the Fourteenth Amendment, the Supreme Court described that the Clause's precursor in the English Bill of Rights was crafted in resistance to the 17th century monarchs who often used "large fines to raise revenue, harass their political foes, and indefinitely detain those unable to pay." *Timbs*, 586 U.S. at 152. This history supports the notion that while a non-monetary sanction might not trigger the Clause on its own, such a provision could reasonably be considered relevant to whether a monetary "fine" is excessive if that provision helps ensnare the individual in a cycle of debt by hindering their ability to pay the monetary fine.

But we need not decide this question here. As we illustrate below, regardless of whether the eligibility provision is included in our analysis of whether the

11

misrepresentation overpayment penalty violates the Excessive Fines Clause, Thigpen's constitutional claim fails. The eligibility provision does not, in the *Timbs* Court's formulation, "indefinitely detain" an individual unable to pay the penalty. *Id.* Moreover, other states impose similar provisions barring individuals from receiving benefits in like circumstances. We therefore assume without deciding that a provision barring an individual from eligibility for benefits can be considered in the analysis of an excessive fines clause claim, when that provision arises along with a traditional fine.

B.

Thigpen alleges that the penalty under Minnesota law for unemployment benefit misrepresentation violates the Excessive Fines Clauses of the United States and Minnesota Constitutions. Thigpen contends that the penalty is unconstitutional both on its face, and as applied to his specific case.

To demonstrate that a statute is unconstitutional on its face, one must carry the heavy burden of "proving that the legislation is unconstitutional in all applications." *Minn. Voters All. v. City of Minneapolis*, 766 N.W.2d 683, 696 (Minn. 2009) (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)). Even a "single situation in which the [statute] might be applied constitutionally" can defeat a facial challenge. *McCaughtry v. City of Red Wing*, 831 N.W.2d 518, 522 (Minn. 2013). "[O]nce a constitutional application is identified, it is inappropriate to speculate regarding other hypothetical circumstances that might arise . . . ." *Minn. Voters All.*, 766 N.W.2d at 694.

12

Therefore, we begin and end with Thigpen's claim that Minn. Stat. §§ 268.18, subds. 2, 2b, and 268.085, subd. 2(2), are unconstitutional as applied to him.[8]

A statute violates the Excessive Fines Clause if it imposes a fine that is "grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). The U.S. Supreme Court has described that the "touchstone" of the Excessive Fines Clause inquiry "is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id.* at 334. But a punishment need not be strictly proportional to a given offense to pass constitutional muster. *Id.* at 336. The Clause, rather, prohibits punishments that are "*grossly* disproportional" to an offense. *Id.* at 334 (emphasis added). This rule appropriately balances the deference we owe to the Legislature as policymakers weighing complex competing interests and our role in protecting individual constitutional rights against government overreach.

In prior cases, beginning with *Rewitzer*, we have distilled U.S. Supreme Court jurisprudence in this area of law to a three-factor test for discerning violations of the Excessive Fines Clause.[9] *Rewitzer*, 617 N.W.2d at 413. We weigh: (1) the "gravity of the

---

[8]    To succeed on a facial challenge, "the challenger must establish that no set of circumstances exists under which the [legislation] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Because Thigpen's as-applied challenge fails, there is at least one set of circumstances in which Minn. Stat. §§ 268.18, subds. 2, 2b, and 268.085, subd. 2(2) are constitutional. It is therefore unnecessary to address his facial challenge separately.

[9]    To establish this test, we drew upon the Supreme Court's analysis in *Solem v. Helm*, 463 U.S. 277 (1983), an Eighth Amendment case from which the Supreme Court in

13

offense" compared with "the harshness of the penalty," (2) the "comparison of the contested fine with fines imposed for the commission of other [offenses] in [Minnesota]," and (3) the "comparison of the contested fine with fines imposed for commission of the same [offenses] in other jurisdictions."[10]  *Id.*

Beyond the *Rewitzer* proportionality factors, Thigpen argues—and the dissent agrees—that we should consider his individualized ability to pay the fine in analyzing his Excessive Fines Clause claim.  Both this court and the U.S. Supreme Court have left open whether the Excessive Fines Clause requires consideration of an individual's financial position in assessing whether a fine is unconstitutionally harsh.  *See Miller v. One 2001 Pontiac Aztek,* 669 N.W.2d 893, 895 (Minn. 2003) (concluding that a fine violated the Excessive Fines Clause "[w]ithout specifically deciding the extent that harshness can be

---

*Bajakajian* gleaned its "gross disproportionality" standard.  *Rewitzer,* 617 N.W.2d at 413; *see Bajakajian*, 524 U.S. at 336.

[10]     DEED argues that we should include another factor in our excessive fines analysis. DEED points out that some federal courts, including the Eighth Circuit, have described "legislative intent" as a relevant "consideration[] in the 'grossly disproportional' analysis" in an Excessive Fines Clause case.  *Qwest Corp. v. Minn. Pub. Utils. Comm'n*, 427 F.3d 1061, 1069 (8th Cir. 2005).  But, as the U.S. District Court for the District of Minnesota recently observed, considering "legislative intent" in an analysis of whether a punishment is unconstitutionally excessive "is something of an oddity," because "[e]very statutory penalty evinces the intent of the legislature to impose that penalty.  The legislature passed the statute, after all."  *U.S. ex rel. Fesenmaier v. Cameron Ehlen Grp.,* 715 F. Supp. 3d 1133, 1160 (D. Minn. 2024).  Thus, "[w]here legislative intent is used to help guide the analysis of the Excessive Fines Clause, 'Congress both levies the fine and, at least as a presumptive matter, determines its constitutionality,' which '[s]eems a bit like letting the driver set the speed limit.' "  *Id*. (quoting *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1318 (11th Cir. 2021) (Newsom, J., concurring)).  We therefore decline DEED's invitation to add a "legislative intent" factor to our Excessive Fines Clause framework.

14

measured by a defendant's unique financial situation"); *Bajakajian*, 524 U.S. at 340 n.15 (concluding a forfeiture violated the Excessive Fines Clause while noting that there were no arguments or factual findings on whether financial resources were relevant to the proportionality assessment). But here, even if we were to consider this as a relevant legal factor in the analysis, Thigpen provides only very limited factual support for his argument. He simply states that he "now owes an enormous debt that he has no means to pay," and notes that his "earnings for the final period of his unemployment period were $288 per week, making the interest payment alone an insurmountable challenge." Accordingly, on this record, even if we were to consider Thigpen's individualized ability to pay as a factor in our analysis, it would have no impact on the outcome. Thus, as with whether the eligibility bar is part of the "fine," we do not decide today whether ability to pay should be a relevant consideration in cases involving Excessive Fines Clause claims. Instead, we turn our attention below to the three *Rewitzer* factors.

1.

We first compare "the gravity of the offense" with "the harshness of the penalty." *Wendell*, 7 N.W.3d. at 417 (citing *Rewitzer*, 617 N.W.2d at 414). This inquiry involves weighing "the harm caused or threatened to the victim or society, and the culpability of the offender." *Solem*, 463 U.S. at 292. For example, in *Wilson v. Commissioner of Revenue,* a corporate employee owed over $45,000 to the state in delinquent sales and income taxes, and the Commissioner of Revenue served a notice of levy on the employee's employer to collect 25 percent of the employee's wages to partially satisfy the debt. 656 N.W.2d 547, 548–49 (Minn. 2003). But when the employer willfully failed to withhold and remit the

wages, the commissioner assessed a penalty consisting of the entire amount of the delinquent debt, plus interest, against the employer. *Id.* at 549. In concluding that the fine was unconstitutionally excessive, we described that the employer's culpability was limited because they had not "participated in the creation of the underlying tax liability." *Id.* at 555. Therefore, Wilson's offense did "not support the harshness of the personal assessment against Wilson." *Id.* at 556.

The gravity of the offense determination in *Wilson* contrasts with *Wendell,* in which a Wisconsin doctor who had made over $500,000 in wages working for a Minnesota company repeatedly filed Minnesota tax returns reporting $0 in taxable Minnesota income. *Wendell,* 7 N.W.3d at 409. We described that Wendell and his wife "failed to report over a million dollars of income from Minnesota sources over 2 years," and that even "[a]fter receiving a warning from the Commissioner of Revenue that a penalty would be imposed" if they continued to file frivolous returns, "the Wendells filed another tax return making the same argument that the payments received from Minnesota sources were not taxable income." *Id.* at 416. We concluded that the $13,223.75 frivolous return penalty assessed to the Wendells was constitutional. *Id.* at 417–418. We weighed the "unnecessary delay and waste of government resources due to the investigation necessary to correct and adjust tax assessments," against "a penalty of up to 25 percent of the tax amount actually owed," and we concluded that the punishment was "proportionate to the harm caused" by frivolous returns. *Id.* at 417.

A recent decision from the Seventh Circuit also helps us assess the first *Rewitzer* prong here. In *Grashoff v. Adams*, 65 F.4th 910, 913 (7th Cir. 2023), an Indiana woman

intentionally misrepresented her employment status in applying for unemployment benefits for 24 straight weeks and argued that the resulting penalty violated the Excessive Fines Clause. Indiana law required that Grashoff pay a 25 percent penalty on her overpayment. *Id.* The district court concluded that the penalty did not violate the Excessive Fines Clause, and the Seventh Circuit affirmed, applying a four-part test distilled from *Bajakaijan*. *Id.* The court described the harm caused by Grashoff's conduct:

> [Grashoff's] knowing nondisclosures led to monetary harm to the unemployment fund in the form of overpaid unemployment benefits. If unchecked and undeterred, this conduct would threaten the viability of this government-administered fund designed to help financially vulnerable unemployed people in Indiana.
>
> Moreover . . . [f]raud like hers complicates the administration of the fund. The Department must spend time and resources investigating fraud and, when detected, remedying it. Put differently, when some claimants don't comply with the baseline requirement to honestly report their income, it becomes harder to administer the fund and complicates the distribution of benefits to all claimants. . . .
>
> Fraud also undermines the integrity of the fund and the public's faith in the state's ability to administer it efficiently and fairly. As other courts have noted when reviewing fines imposed under the False Claims Act, fraud "erodes the public confidence in the [g]overnment's ability to manage" the defrauded program.

*Grashoff*, 65 F.4th at 920 (quoting *United States v. Eghbal*, 548 F.3d 1281, 1285 (9th Cir. 2008)).

This case is not identical to *Grashoff*. The monetary penalty for misrepresentation in Minnesota is larger than the fine for unemployment benefit fraud in Indiana,[11] and

---

[11]    The fine under Indiana law at issue in *Grashoff* was a 25 percent penalty, while Minnesota law requires a 40 percent penalty. *See* Ind. Code § 22-4-13-1.1(b); Minn. Stat. § 268.18, subd. 2.

17

Indiana also does not have Minnesota's 10-year bar on benefit eligibility. Indeed, the *Grashoff* court cites Minnesota's statute in a string of examples of harsher punishments from other states seemingly intended to illustrate the reasonableness of Indiana's fine. *Grashoff*, 65 F.4th at 919.[12]

But the harm caused to the State of Minnesota by Thigpen's conduct here is like the harm caused in *Grashoff*—and like the Seventh Circuit in that case, we conclude that the harshness of the penalty under Minnesota law is not grossly disproportional to the gravity of Thigpen's offense. Thigpen, for 104 straight weeks, reported to DEED that he was not earning any wages, when he was, in fact, working nearly full-time as a PCA. Thigpen argues that the "mitigating circumstances"—including navigating the COVID-19 pandemic as a caregiver for his mother and his young siblings, and the fact that he was a first-time benefit recipient and failed to understand the complicated paperwork—make his offense less "grave." Although Thigpen, like many others, presumably faced challenging circumstances during the COVID-19 pandemic, the unemployment law judge determined that Thigpen obtained unemployment benefits through misrepresentation—an important consideration that bears on our analysis—and the correctness of that determination is not before us. The 40 percent penalty here is substantial, but it resembles the 25 percent penalty in *Grashoff*, as well as the 25 percent penalty we upheld in our *Wendell* case,[13] which

---

[12] On the other hand, Thigpen's 104 weeks of misrepresentation could make his offense more "grave" than Grashoff's 24 weeks of false statements.

[13] As we elaborate on below, the penalty at issue in *Wendell* is also relevant to our comparison between the penalty at issue with penalties for similar offenses in Minnesota.

punished similar conduct. We also note that under the statute, if a person still has an outstanding balance on their overpayment and penalty after ten years, their entire balance is eliminated. Minn. Stat. § 268.18, subd. 4(b). This provision ensures that no person is indefinitely encumbered by an unpayable penalty, and in our view makes the penalty less harsh. And here, unlike *in Wilson*, the entire punishment is directly tied to Thigpen's own unlawful actions. *See Wilson,* 656 N.W.2d at 555 (noting that the employer had not "participated in the creation of the underlying tax liability"). We therefore conclude that the first *Rewitzer* prong weighs against Thigpen's claim.

2.

The second *Rewitzer* factor involves "compar[ing] the penalty . . . to the penalties imposed for similar offenses in Minnesota." *Wendell*, 7 N.W.3d at 417. *Solem* provides guidance that "if more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive." *Solem*, 463 U.S. at 291.

Thigpen points to other statutes in Minnesota that impose less severe punishments for similar, or worse, misconduct. For example, Thigpen cites the new Minnesota Paid Leave law, which, while not yet in effect,[14] imposes a 15 percent penalty that accrues at a rate of 6 percent per year for misrepresentation overpayments. *See* Minn. Stat. § 268B.185, subds. 2(b), 4. The paid leave statute also does not bar those with an outstanding balance due to a misrepresentation penalty from receiving paid leave benefits for which they

---

[14] Minnesota Statutes section 268.185 goes into effect January 1, 2026.

19

otherwise would be eligible, instead allowing them to pay their debt via an offset of their benefits of up to 20 percent. *Id.* § 268B.185, subd. 5.

DEED responds that Minnesota law imposes more severe punishments for similar conduct in other contexts. First, DEED points to Minn. Stat. § 289A.60, part of which we upheld in *Wendell*, 7 N.W.3d at 416, which includes a 50 percent penalty for failure to file or filing a false or fraudulent tax return, Minn. Stat. § 289A.60, subd. 6, and a 20 to 50 percent penalty for "promoting abusive tax shelters," Minn. Stat. § 289A.60, subd. 20. Section 289A.60, subd. 6(b), also imposes a 50 percent penalty for any refund received "that is attributable to fraud." DEED notes that these penalties "are in addition to the criminal penalties [in section 289A.63]." *See* Minn. Stat. § 289A.60, subd. 19.[15]

---

[15] DEED also cites to the Minnesota False Claims Act, under which a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," is liable to the state for a civil penalty under the federal False Claims Act, "plus three times the amount of damages that the state or the political subdivision sustains because of the act of that person." Minn. Stat. § 15C.02(a)(1); *see* 31 U.S.C. § 3279(a)(1). Thigpen argues that the "FCA applies to sophisticated government contractors, not workers with widely varying ages, levels of education, and levels of English proficiency, as is the case with unemployment insurance misrepresentation." Because of how different the type of offense is, Thigpen argues, the relative punishment is not very instructive. We agree and thus do not find DEED's comparison to the False Claims Act instructive.

Similarly, both parties compare Minnesota's unemployment penalties to the state's criminal penalties for fraud.[16]  *See* Minn. Stat. § 609.52 (2022).[17]  We need not decide whether this comparison demonstrates the fine's excessiveness or reasonableness because, at bottom, the parties' arguments on this prong of the *Rewitzer* test leads us to a similar conclusion as in *Wendell*: "[a]lthough some [penalties in Minnesota for similar offenses] are lower than [the unemployment misrepresentation overpayment penalty], some are also higher."  *Wendell,* 7 N.W.3d at 417.  The Excessive Fines Clause requires a finding of "gross disproportionality."  *Bajakajian,* 524 U.S. at 336.  Because the statutory penalties challenged here, while harsh, are not necessarily an outlier among other punishment schemes found in Minnesota statutes, we view the second prong of our analysis as weighing against Thigpen's claim.

3.

Lastly, we "compare[] the penalty . . . to penalties imposed for the same offense in other jurisdictions."  *Wendell*, 7 N.W.3d at 417.  Thigpen argues that Minnesota's penalty

---

[16]    Thigpen notes that if an individual stole by fraud the same amount of unemployment benefits that Thigpen did through misrepresentation—$24,005—the largest financial penalty they could be assessed under Minnesota law would be $20,000.  *See* Minn. Stat. § 609.52, subd. 3.  Here, Thigpen was assessed a $9,602 penalty, nearly half the maximum penalty for criminal theft, which Thigpen argues is a sign of the fine's excessiveness. DEED contends that this comparison cuts the other way—that the maximum criminal penalty being over twice the amount of the misrepresentation penalty in fact demonstrates the reasonableness of the latter.  We need not now resolve how criminal penalties compare to civil penalties in the context of the Excessive Fines Clauses.

[17]    Minor revisions were made to the definitions and sentence provisions of Minn. Stat. § 609.52 in 2023 and 2024.  These amendments have no impact on the analysis.

scheme for unemployment benefit misrepresentation is a significant outlier among the 50 states. We disagree.

Each state imposes a monetary penalty for obtaining unemployment benefit overpayments through fraud or misrepresentation.[18] Federal law requires that each state impose a penalty of at least 15 percent for instances of unemployment benefit fraud or misrepresentation, and many states impose the federally mandated minimum.[19] Minnesota's penalty rate, over twice the federal minimum, is onerous. But multiple states have penalty rates that match or exceed Minnesota's for a first instance of a fraud-related overpayment, and several additional states have penalties that increase for each successive instance of fraud.[20] Similarly, although Minnesota's interest rate of 1 percent per month is

---

[18]     United States Dep't of Labor, *Comparison of State Unemployment Laws* 6-6–6-10 (2023).

[19]     42 U.S.C. § 503(a)(11)(A). Among the states that impose a 15 percent penalty are: Arizona (Ariz. Rev. Stat. Ann. § 23-787(B)); Delaware (Del. Code Ann. tit. 19, § 3325(c)(1)); Georgia (Ga. Code Ann. § 34-8-255(a)(1)); Hawaii (Haw. Rev. Stat. § 383-44(b)); Iowa (Iowa Code § 96.16(4)(b)); Kentucky (Ky. Rev. Stat. Ann. § 341.415(6)); Maryland (Md. Code Ann., Lab. & Emp. § 8-809(b)(2)); Massachusetts (Mass. Gen. Laws ch. 151A, § 69(e)); New York (N.Y. Lab. Law § 594(4)); North Carolina (N.C. Gen. Stat. § 96-18(h)); North Dakota (N.D. Cent. Code § 52-06-33); Pennsylvania (43 Pa. Stat. and Cons. Stat. § 871(c)); Rhode Island (28 R.I. Gen. Laws Ann. § 28-42-68(c)); Vermont (Vt. Stat. Ann. tit. 21, § 1347(c); Virginia (Va. Code Ann. § 60.2-636(A)).

[20]     Among these states are: Alaska (50 percent) (Alaska Stat. § 23.20.390(f)); Arkansas (50 percent) (Ark. Code Ann. § 11-10-532(a)(3)(A)); Connecticut (50 percent) (CT Gen Stat § 31-273, (2)(B)); Maine (50 percent) (Me. Rev. Stat. Ann. tit. 26 § 1193(6)); Michigan (100 percent) (Mich. Comp. Laws. § 421.54(b)(i)); Montana (50 percent) (Mont. Code Ann. § 39-51-3201(1)(a)(ii)); South Dakota (50 percent) (S.D. Codified Laws § 61-6-39); Utah (100 percent) (Utah Admin. Code R994-406-403(4)(b)); Wisconsin (40 percent) (Wis. Stat. 108.04(11)(bh)).

high, several states charge higher rates of interest.[21] And finally, like Minnesota, multiple other states have some sort of provision barring individuals from being eligible to receive benefits for an instance of fraud or misrepresentation.[22] We therefore conclude that, while onerous, Minnesota's penalty scheme is within the range of penalties for similar conduct among the fifty states, and thus the third *Rewitzer* prong weighs against Thigpen's Excessive Fines Clause challenge.

\*     \*     \*

After analyzing Thigpen's claim under the Excessive Fines Clause test established in *Rewitzer*, we conclude that the punishment under Minnesota law for unemployment benefit misrepresentation overpayments is not "grossly disproportional" to the offense and therefore does not violate the Excessive Fines Clauses of the United States and Minnesota Constitutions.

---

[21] Such as Alabama (Ala. Code § 25-4-145 (c)(4) (2 percent monthly interest)); North Dakota (N.D. Cent. Code § 52-06-33 (1.5 percent monthly compound interest)); and Tennessee (Tenn. Code Ann. § 50-7-715(c)(1) (up to 1.5 percent monthly interest on unpaid amount).

[22] Examples include Arizona (Ariz. Rev. Stat. Ann. § 23-787(B) (prohibiting a person who fraudulently received benefits from "receiv[ing] any benefits under this chapter until the total amount of the overpayment and all penalties and interest have been recovered or otherwise satisfied in compliance with a civil judgment" and stating that "[f]raud overpayments and penalties may not be waived"); Arkansas (Ark. Code Ann. § 11-10-532(a)(3)(B) (prohibiting a person who fraudulently received an overpayment of benefits from receiving further benefits until the overpayment "as well as any other penalties, interest, and costs assessed as a result of the fraudulent activity" are repaid)); and Maryland (Md. Code Ann. Lab. & Empl. § 8-1305(b)(2) (providing that a person who fraudulently obtains benefits is disqualified from receiving benefits until the unlawfully obtained benefits, penalty, and interest are repaid in full or, in the Secretary's sole discretion, the benefit and interest are uncollectible and the individual repaid the penalty in full).

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.

DISSENT

HENNESY, Justice (dissenting).

I respectfully dissent. I would hold that Minnesota courts must consider a person's ability to pay a fine in analyzing their claim under the Excessive Fines Clause of the Minnesota and United States Constitutions. I would therefore reverse the court of appeals' decision and remand to that court with instructions to remand to the unemployment law judge to develop an evidentiary record that is sufficient to determine Thigpen's ability to pay as part of the Excessive Fines Clause analysis.

A.

The court of appeals, in concluding that Thigpen's penalty was not unconstitutionally excessive, *Thigpen v. Best Home Care LLC*, No. A23-1544, 2024 WL 3564541, at *1 (Minn. App. July 29, 2024), analyzed his claim under the three factors we have established as the proper inquiry in Excessive Fines Clause cases:

> (1) the gravity of the offense compared to the harshness of the penalty; (2) comparison of the contested penalty with other penalties imposed for other offenses in the same jurisdiction; and (3) comparison of the contested fine with fines imposed for the same offense in other jurisdictions.

*Wendell v. Comm'r of Revenue*, 7 N.W.3d 405, 416 (Minn. 2024).

Thigpen argues that we should consider his ability to pay the $15,842 penalty in addition to these three factors. The majority leaves this question for another day, assuming without deciding that ability to pay is a factor in the Excessive Fines Clause analysis, as our court did once before in *Miller v. One 2001 Pontiac Aztek*, 669 N.W.2d 893, 897 (Minn. 2003) ("Without specifically deciding the extent that harshness can be measured by a

D-1

defendant's unique financial situation, we conclude on the record before us that the district court abused its discretion in finding that [the fine] was a violation of [the Excessive Fines Clause].").  I would decide this today, bringing Minnesota within the growing group of states whose high courts have recognized that courts must consider a person's ability to pay in assessing their Excessive Fines Clause claim.

The U.S. Supreme Court has never spoken definitively on whether an individual's financial circumstances are relevant in an excessive fines analysis under the U.S. Constitution.  *See, e.g.*, *United States v. Bajakajian*, 524 U.S. 321, 334, 340 n.15 (1998) (holding that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense" but not addressing whether a person's income is relevant to this proportionality determination, noting that respondent had not made such an argument and the district court had made no factual findings on this issue).[1]  Nor does the text of the Eighth Amendment answer this question.  As Judge Newsom of the Eleventh Circuit noted, in examining whether the Eighth Amendment requires consideration of an individual's ability to pay: "Looking solely at the text of the Excessive Fines Clause, one is left to wonder, excessive in relation to *what*?"  *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1321 (11th Cir. 2021) (Newsom, J., concurring).

---

[1]     *See also* Wesley Hottot, *What is an Excessive Fine?  Seven Questions to Ask After Timbs*, 72 Al. L. Rev. 581, 605 (2021) (noting that the U.S. Supreme Court has "acknowledged, but not yet adopted," a "prohibition on taking away a person's means of survival and of lawfully providing for themselves").

Though the Supreme Court has not decided whether ability to pay is a factor under the Excessive Fines Clause, its discussions of the clause's historical purposes provide support for the notion that a person's economic status is relevant to determining whether a fine is excessive. Recently, in *Timbs v. Indiana*, the Court observed that "[t]he Excessive Fines Clause traces its venerable lineage back to at least 1215" when "Magna Carta required that economic sanctions 'be proportioned to the wrong' and 'not be so large as to deprive [an offender] of his livelihood.' " 586 U.S. 146, 151 (2019) (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 256, 271 (1989)) (alteration in original). But even more compelling than invoking thirteenth-century English law is the Court's description of the use of fines in post-Civil War America—which the Court relied on to support its conclusion that the Excessive Fines Clause's protections are incorporated against the states via the Fourteenth Amendment:

> By [1868], the constitutions of 35 of the 37 States . . . expressly prohibited excessive fines. Notwithstanding the States' apparent agreement that the right guaranteed by the Excessive Fines Clause was fundamental, abuses continued. Following the Civil War, Southern States enacted Black Codes to subjugate newly freed slaves and maintain the prewar racial hierarchy. Among these laws' provisions were draconian fines for violating broad prescriptions on 'vagrancy' and other dubious offenses. When newly freed slaves were unable to pay imposed fines, States often demanded involuntary labor instead.

*Id.* at 152–53 (citations omitted). The Court summarized: "For good reason, the protection against excessive fines has been a constant shield throughout Anglo-American history: Exorbitant tolls undermine other constitutional liberties." *Id.* at 153. The Court emphasized that fines have been a tool of the state "to retaliate against or chill the speech of political enemies," and observed that "[e]ven absent a political motive, fines may be

employed in a measure out of accord with the penal goals of retribution and deterrence, for fines are a source of revenue, while other forms of punishment cost a state money." *Id.* at 153–54 (citations omitted) (internal quotation marks omitted).

A growing number of jurisdictions, in part spurred on by the Court's historical discussions in *Timbs*, have recognized that a person's ability to pay is critical to the excessiveness analysis.[2] Multiple federal courts of appeals (including the Eighth Circuit) have explicitly adopted the ability to pay as a factor in the Excessive Fines Clause inquiry. *E.g.*, *United States v. Lippert*, 148 F.3d 974, 978 (8th Cir. 1998) ("[I]n the case of fines, as opposed to forfeitures, the defendant's ability to pay is a factor under the Excessive Fines Clause."); *United States v. Aleff*, 772 F.3d 508, 512 (8th Cir. 2014) (noting that "[p]roportionality is determined by a variety of factors," including "Legislative intent" and "the defendant's ability to pay"); *United States v. Viloski*, 814 F.3d 104, 111 (2d Cir. 2016) ("[I]t seems unlikely that the *Bajakajian* Court meant to preclude courts from considering whether a forfeiture would deprive an offender of his livelihood."); *United States v. Levesque*, 546 F.3d 78, 83 (1st Cir. 2008) ("Beyond the three [proportionality] factors . . . a court should also consider whether forfeiture would deprive the defendant of his or her livelihood."). Several state high courts have done the same—including Colorado, Indiana,

---

[2] Some jurisdictions have reached the opposite conclusion. *See, e.g.*, *United States v. Dubose*, 146 F.3d 1141, 1146 (9th Cir. 1998) (concluding that "an Eighth Amendment gross disproportionality analysis does not require an inquiry into the hardship the sanction may work on the offender"); *United States v. Dicter*, 198 F.3d 1284, 1292 n.11 (11th Cir. 1999) ("[W]e do not take into account the personal impact of a forfeiture on the specific defendant in determining whether the forfeiture violates the Eighth Amendment.").

Montana, Oregon, Pennsylvania, Tennessee, Utah, and Washington.[3] These decisions affirm not only that the Excessive Fines Clause's history provides "persuasive evidence that a fine that is more than a person can pay may be 'excessive' within the meaning of the Eighth Amendment," *Colo. Dep't of Lab. & Emp. v. Dami Hosp., LLC*, 442 P.3d 94, 101 (Colo. 2019), but also, more importantly, that this rule makes good sense. As the Supreme Court of Indiana reasoned in a case involving the forfeiture of physical property:

> To conduct a proportionality analysis at all, we need to consider the punishment's magnitude. And the owner's economic means—relative to the property's value—is an appropriate consideration for determining that magnitude. To hold the opposite would generate a new fiction: that taking

---

[3] State cases supporting considering an individual's ability to pay when assessing fines include: *Colorado Department of Labor & Employment v. Dami Hospitality, LLC*, 442 P.3d 94, 101–02 (Colo. 2019); *State v. Timbs*, 134 N.E.3d 12, 36–37 (Ind. 2019) (recognizing that "the Court in *Bajakajian* took no position on whether a person's income and wealth are relevant considerations in judging the excessiveness of a fine" but concluding that "the forfeiture's effect on the owner is an appropriate consideration in determining the harshness of the forfeiture's punishment"); *State v. Yang*, 452 P.3d 897, 904 (Mont. 2019) (noting that "the financial resources of the offender, and the nature of the burden that payment of the fine will impose," are "factors that are important to a constitutional inquiry under the Eighth Amendment and Montana's Constitution"); *State v. Goodenow*, 282 P.3d 8, 17 (Or. Ct. App. 2012) ("When assessing the severity of a defendant's forfeiture, courts consider the amount of the forfeiture and the effect of the forfeiture on the defendant."); *Commonwealth v. 1997 Chevrolet and Contents Seized from Young*, 160 A.3d 153, 188 (Penn. 2017) ("[W]e believe it proper to consider the financial or other consequences of forfeiture upon the property owner, and any innocent third parties."); *Stuart v. State Department of Safety*, 963 S.W.2d 28, 36 (Tenn. 1998) ("A forfeiture is less likely to be excessive when the claimant has the financial ability to replace the property without undue hardship."); *State v. Real Property at 633 East 640 North, Orem, Utah*, 994 P.2d 1254, 1260 (Utah 2000) ("In judging the harshness of the forfeiture . . . a court should look at . . . the hardship to the defendant, including the effect of the forfeiture on defendant's family or financial condition."); *City of Seattle v. Long*, 493 P.3d 94, 111 (Wash. 2021) ("While the [U.S. Supreme] Court has not yet decided whether ability to pay is required, the history of the Eighth Amendment suggests it is.").

away the same piece of property from a billionaire and from someone who owns nothing else punishes each person equally.

*State v. Timbs*, 134 N.E.3d 12, 36 (Ind. 2019).

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Bajakajian*, 524 U.S. at 334. Our court has long held that whether a fine is constitutionally proportionate depends in part on the punishment's "harshness." *See, e.g., Rewitzer*, 617 N.W.2d at 413–14, 415 (adopting the Supreme Court's test from *Solem v. Helm*, 463 U.S. 277, 288 (1983), which includes assessing "the harshness of the penalty," to determine the proportionality of a fine); *Wendell*, 7 N.W.3d at 416–17 (reiterating the test adopted in *Rewitzer* and comparing "the gravity of the offense" with "the harshness of the penalty" in evaluating whether a fine was proportional), *Wilson v. Comm'r of Revenue*, 656 N.W.2d 547, 555 (Minn. 2003) (same). In my view, a judge must consider the amount of a fine relative to a person's financial situation to determine the fine's severity. A $10,000 fine, for example, will impact a person who earns minimum wage and supports a family far more than a single person who earns a six-figure salary; a judge should be able to consider that impact in determining whether the penalty is constitutional.

Holding that a person's financial circumstances are relevant when assessing the harshness of a monetary penalty would not require fines to be directly proportional to a person's financial circumstances in all cases. As the Colorado Supreme Court has reasoned:

> A fine that would bankrupt a person or put a company out of business would be a substantially more onerous fine than one that did not. For some types of criminal or regulatory infractions, a penalty that would have that kind of grave consequence might be warranted, whereas for others the severity of that outcome may be out of proportion to the gravity of the offense for which the fine is imposed.

*Dami*, 442 P.3d at 102. But including this factor as *one consideration* in our constitutional analysis would allow courts to better effectuate the purpose of the Excessive Fines Clause and root out those fines which render "the punishment [] more criminal than the crime." *Timbs*, 134 N.E.3d at 28 (citation omitted) (internal quotation marks omitted). I would therefore hold that a person's ability to pay a fine must be considered in assessing their claim under the Excessive Fines Clause of the U.S. Constitution. U.S. Const. amend. VIII.

## B.

I would separately reach the same holding—that courts must consider a person's ability to pay in weighing the harshness of a fine—under the Excessive Fines Clause of the Minnesota Constitution. Minn. Const. art. 1, § 5. "As a separate source of rights, the Minnesota Constitution may under certain circumstances provide greater protection than the United States Constitution." *State v. McMurray*, 860 N.W.2d 686, 690 (Minn. 2015). In a previous case involving the Excessive Fines Clause, our court observed that "[w]hen we interpret a clause of our state constitution that is identical to a clause of the federal constitution, a decision of the United States Supreme Court is of inherently persuasive, but not necessarily compelling, force." *Wilson*, 656 N.W.2d at 552. As I have noted, the United States Supreme Court has not yet decided whether ability to pay should be considered under the Excessive Fines Clause of the U.S. Constitution. *See, e.g.*,

D-7

*Bajakajian*, 524 U.S. at 334–37, 340 n.15.  Because I conclude, for the reasons cited above, that a court cannot determine whether a fine is excessive without considering a person's ability to pay that fine, I would separately and independently interpret the Minnesota Constitution's Excessive Fines Clause to require consideration of ability to pay to ensure Minnesotans are afforded this protection.  *See Kahn v. Griffin*, 701 N.W.2d 815, 828 (Minn. 2005) ("As the highest court of this state, we have said that we are and should be the first line of defense for individual liberties within the federalist system.  We have stated that we have a duty to independently safeguard the rights of our citizens." (citations omitted) (internal quotation marks omitted)).

C.

Lastly, I turn to the question of the appropriate relief.  In a similar case, the Colorado Supreme Court, after concluding that ability to pay was a relevant consideration in assessing a fine's constitutionality, reversed the Colorado court of appeals and determined that a remand was required.  *Dami*, 442 P.3d at 103.  The court observed that "[t]here is scant evidence in the record before us, particularly about [the defendant's] ability to pay the daily fines."  *Id.*  Because the court was announcing a new relevant factor for determining the harshness of a monetary penalty, it concluded it was necessary to "remand to the court of appeals so that it can return the case to the [workers' compensation court]" to "permit the parties to develop a record that permits a complete evaluation of whether the . . . fine imposed . . . was constitutionally excessive . . . ."  *Id.*  I would likewise reverse and remand to the court of appeals so that it can remand to the unemployment law judge to

develop an evidentiary record sufficient to apply this Excessive Fines Clause analysis as to Thigpen's ability to pay.

*    *    *

For low-income Minnesotans, legal financial obligations can be an immense burden.[4] These fines and fees, while they "may not seem large to the legal professionals who are responsible for their imposition and enforcement," can force those who are unable to keep up with monthly payments "into a seemingly endless cycle of missed payments, penalties for missed payments that exacerbate the person's underlying economic difficulties, and then yet more missed payments and sanctions." Michael O'Hear, *Can the Excessive Fines Clause Mitigate the LFO Crisis? An Assessment of the Caselaw*, 108 Minn. L. Rev. 1171, 1175–76 (2024). I would hold in this case that an individual's ability to pay a fine must be part of the inquiry into whether that fine is excessive in violation of the Minnesota and United States Constitutions, and I would remand to permit

---

[4] Mid-Minnesota Legal Aid, as amicus curiae, also notes that there is little evidence that exorbitant fines are effective at deterring crime; instead, they perpetuate the poverty cycle and deeply-rooted societal divisions. *See* Devah Pager et al., *Criminalizing Poverty: The Consequences of Court Fees in a Randomized Experiment*, 87 Am. Socio. Rev. 529, 529–53 (2022); *Fines and Fees Index Minnesota*, Nat'l Ctr. for Access to Just. (2022) ("Fines and fees can keep people in a cycle of poverty, causing people to lose their jobs, their homes, and sometimes their children. . . . They create a two-tiered system, placing justice out of reach for many low-income people, including a disproportionate number of people of color."); *cf.* Michael O'Hear, *Can the Excessive Fines Clause Mitigate the LFO Crisis? An Assessment of the Caselaw*, 108 Minn. L. Rev. 1171, 1171 (2024) ("These legal financial obligations . . . likely entrench racial and socioeconomic divides and contribute to the breakdown of trust in the police and courts in disadvantaged communities.").

the development of an evidentiary record sufficient to allow for the consideration of Thigpen's ability to pay in the Excessive Fines Clause analysis.

For these reasons, I respectfully dissent.

PROCACCINI, Justice (dissenting).

I join in Parts B and C of Justice Hennesy's dissent because I agree that Article 1, Section 5, of the Minnesota Constitution, which protects Minnesotans from excessive fines, requires an analysis of an individual's ability to pay the fine imposed. As Justice Hennesy explains, adopting this approach would honor the history of the Excessive Fines Clause in the Minnesota Constitution, address the fundamental need for proportionality in fines imposed by the government, and bring Minnesota constitutional law into harmony with several other jurisdictions. I also agree that remand would be appropriate on that issue.

Although I agree with Justice Hennesy's well-reasoned conclusion that the Eighth Amendment of the United States Constitution should also require an analysis of an individual's ability to pay, the United States Supreme Court has not addressed that issue, and we need not reach it here. *Cf. Deegan v. State*, 711 N.W.2d 89, 96–98 (Minn. 2006) (noting that we were "hesitant to predict how the Supreme Court would view [the issue under the United States Constitution]" and accordingly deferring "the question of whether the United States Constitution guarantees the right [at issue]" and resolving the case based on our interpretation of the Minnesota Constitution).